**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SIENNA LYONS, | : | Civil Action No.: |
| | : | |
| DANIELLE LABELLE, & | : | |
| | : | |
| SAUNDRA O'DONNELL | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GREAT LAKES EDUCATIONAL LOAN | : | |
| SERVICES, INC., NELNET, INC., | : | |
| NELNET DIVERSIFIED SOLUTIONS | : | |
| LLC; and NELNET SERVICING LLC, | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants | : | |
| | : | |

## CLASS ACTION COMPLAINT

Plaintiffs Sienna Lyons, Danielle LaBella, and Saundra O'Donnell (collectively "Plaintiffs"), by and through their undersigned counsel, individually and on behalf of all others similarly situated, for their Class Action Complaint, allege against Defendants Great Lakes Educational Loan Services, Inc., Nelnet, Inc., Nelnet Diversified Solutions, LLC, and Nelnet Servicing LLC (collectively "Defendants") as follows based on personal knowledge, investigation of counsel, information and belief, and publicly available information:

## PRELIMINARY STATEMENT

1.     This is a class action complaint brought on behalf of student loan borrowers for the fraudulent, illegal, and negligent actions and inactions of Defendants with respect to their misallocation of payments made by Plaintiffs and others similarly situated.

## PARTIES

2.     Plaintiff Sienna Lyons is an adult citizen of the State of New Jersey domiciled in

1

the County of Atlantic at 5509 Monmouth Avenue, Ventnor City, NJ 08406.

3.      Plaintiff Danielle LaBella is an adult citizen of the State of New Jersey domiciled in the County of Ocean at 375 Dogwood Drive, Brick, NJ 08723.

4.      Plaintiff, Saundra O'Donnell is an adult citizen of the State of New Jersey domiciled in the County of Camden at 16 Josie Lane, Atco, NJ 08004.

5.      Defendant Great Lakes Educational Loan Services, Inc. ("Great Lakes") is a Wisconsin corporation with its principal place of business at 2401 International Lane, Madison, WI 53704. Great Lakes Educational Loan Services, Inc. is the wholly owned servicing subsidiary of Great Lakes Higher Education Corporation. Great Lakes Educational Loan Services, Inc. services millions of federal student loans on behalf of the United States Department of Education.  In addition to servicing Plaintiffs' federal student loans in New Jersey, Great Lakes services other federal student loans in New Jersey and nationwide.

6.      Defendant Nelnet, Inc. ("Nelnet") is a Nebraska corporation with its principal place of business at 121 South 13th Street, Suite 201, Lincoln, NE 68508. Nelnet, Inc. owns over 50 subsidiaries that administer and collect student loans throughout the United States and Canada, including Defendants Nelnet Servicing LLC and Nelnet Diversified Solutions LLC. Nelnet and its subsidiaries service federal student loans in New Jersey and nationwide.

7.      Defendant Nelnet Servicing LLC is a wholly owned subsidiary of Defendant Nelnet Diversified Solutions, LLC, which is itself a wholly owned subsidiary of Nelnet, Inc.

8.      Nelnet, Inc., Nelnet Servicing LLC, and Nelnet Diversified Solutions LLC will be collectively referred to as "Nelnet" herein.

## JURISDICTION AND VENUE

9.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) as

the matter in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and is a class action in which a member of the class of Plaintiffs is a citizen of a state different from Defendants.

10.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the matter in controversy arises under the laws of the United States.

11.     The Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with New Jersey such that the exercise of jurisdiction by this Court is consistent with notions of fair play and substantial justice. Defendant routinely conducts business in New Jersey and otherwise avail themselves of the protections and benefits of New Jersey law through the advertising, marketing, distribution, and sale of their services in New Jersey, and this action arises out of or relates to these contacts.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the within claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.     The Federal Student Loan Program and Servicing Contracts

13. The United States Department of Education ("DOE") is the nation's largest provider of student financial aid for education beyond high school.

14.     Within the DOE, the Federal Student Aid ("FSA") office is responsible for servicing all loans originated through the William D. Ford Federal Direct Loan ("Direct Loan")

Program and the Federal Family Education Loan ("FFEL") Program loans purchased from non-federal entities.[1]

15.     In 2009, the DOE awarded Defendants with contracts to service federal student loans, which are attached hereto as Exhibit A (hereafter referred to as the "Servicing Contracts").

16.     The Servicing Contracts each have a term of five (5) years, with an option to extend an additional five (5) years.  Exhibit A at p. 10, section B.13(B).

17.     Among over things, the Servicing Contracts require Defendants to understand applicable federal regulations, meet statutory and legislative requirements, and ensure that all aspects of servicing comply with DOE requirements.

18.     To that end, the Servicing Contracts explicitly state that all servicers must "be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur."  Exhibit A at p. 20, section C.1.4.3.

19.     The Servicing Contracts further require servicers to "provide a service flexible enough to handle new requirements generated by Congress and respond to legislative mandates and policy changes."  Exhibit A at p. 20, section C.1.4.4.

20.     The Servicing Contracts guarantee a minimum of $5,000,000.00 in revenue to each service "provided that [they] [are] in compliance with the requirements for servicing federally held debt…"  Exhibit A at p. 10, section B.13(A).

21.     In 2011, FSA started contracting with additional servicers.

---

[1] In 2008, the DOE started purchasing outstanding FFEL program loans, as authorized under the Ensuring Continued Access to Student Loans Act of 2008 (Public Law 110-227).  Direct Loans and FFEL loans purchased by the DOE are referred to collectively herein as "federal student loans" or "federally held student loans."

22.     On September 1, 2015, an option to extend the Servicing Contracts an additional five (5) years was exercised with Great Lakes Educational Loan Services, Navient, LLC, Nelnet Servicing, LLC, and PHEAA.

23.     In 2017, Nelnet acquired Great Lakes for $150 million in an all-cash transaction.

24.     As of March 2020, Great Lakes manages $260.3 billion in government-owned loans for over 8 million borrowers.

25.     As of March 2020, Navient manages $229.7 billion in government-owned loans for over 6 million borrowers.

26.     As of March 2020, Nelnet manages $196.1 billion in government-owned loans for over 6 million borrowers.

27.     As of March 2020, PHEAA manages $374.3 billion in government-owned loans for over 7.9 million borrowers.

28.     All contracted servicers are responsible for collecting payments on federally held student loans that are not in default status, advising borrowers on available resources to better manage their loan obligations, responding to borrowers' inquiries, and performing other administrative tasks associated with collecting and servicing federally held student loans on behalf of the DOE.

29.     Among the many requirements with which they must adhere, the Servicing Contracts require servicers to:

      a.   Correctly record the borrowers' interest rates and calculate the borrowers' balances;

      b.   Correctly apply payments to borrowers' accounts;

      c.   Properly grant forbearances and deferments to borrowers;

d.   Appropriately capitalize loan interest;

e.   Follow guidelines for delinquency notice letters, telephone calls, and skip

tracing activities as they pertain to the collection of loans;

f.   Properly process borrowers' application of income-driven repayment plans;

and

g.   Maintain complete and accurate records to support borrower repayment plans.

30.   The Servicing Contracts require the servicers to provide the DOE with a copy of

any lawsuit within 10 days of the complaint being served.

31.   The "Invoicing and Non-Compliance" section of every servicer's contract states

the following:

> Borrowers whose loans are not being serviced in compliance with the
> Requirements, Policy and Procedures for servicing federally held debt due
> to the fault of the servicers (i.e. correct interest calculations, correct
> balances, interest determination and calculations, notices sent properly,
> proper due diligence, etc.), will not be billable to the Government from the
> initial point of non-compliance.  Any funds that have been invoiced for
> these borrowers and paid shall be returned to the Government via a credit
> on the next invoice.

Exhibit A at p. 12, section B.13(L).

32.   According to the Servicing Contracts, servicers are responsible for all supplies,

services, and other costs to service borrower accounts.  This includes costs for bringing

contractor systems into compliance for handling federally held debt and costs for legislative,

regulatory, or policy changes that affect the servicing of borrower accounts.  Exhibit A at p. 13,

section B.13(N)(5).

33.   Servicers bill the DOE for each individual borrower account serviced.  The billing

amount is based on the number of borrower accounts serviced and the status of each borrower

account.

34.    The Servicing Contracts include a pricing structure for in-school, grace or repayment, deferment or forbearance, and delinquent borrower account statuses.

35.    For instance, the DOE pays Defendants an average monthly fee for each loan serviced. The fee depends on loan status and total volume of loans in the category serviced. The Servicing Contract's fee schedule is set forth in the table below. It includes a "unit price," or monthly payment due for loans in seven different status categories, including "in-school status," "grace or current repayment status," "deferment or forbearance," and durations of delinquency:

| Status | Volume Low | Volume High | Unit Price |
|---|---|---|---|
| Borrowers in in-school status | n/a | n/a | $1.05 |
| Borrowers in grace or current repayment status | 1 | 3,000,000 | $2.11 |
| | 3,000,001 | UP | $1.90 |
| Borrowers in deferment or forbearance | 1 | 1,600,000 | $2.07 |
| | 1,600,000 | UP | $1.73 |
| 31-90 days delinquent | n/a | n/a | $1.62 |
| 91-150 days delinquent | n/a | n/a | $1.50 |
| 151-270 days delinquent | n/a | n/a | $1.37 |
| 270+ days delinquent | n/a | n/a | $0.50 |

Exhibit A at p. 13, section B.13(N)(3).

36.    An escalation methodology is included in the Servicing Contracts based upon the Bureau of Labor Statistics Employment Cost Index for Total Compensation, Private Industry, Service Occupations, to account for significant inflation and/or deflation.  When the

Employment Cost Index exceeds 3.0% (plus or minus) in any given year, the DOE will adjust the established common pricing by any amount in excess of the rate.  Thus, the above unit prices are not necessarily representative of the current fee structure.

37.     This fee structure gives Defendants a financial incentive to maintain or increase the number of borrowers in their portfolios, while minimizing the number of borrowers who successfully earn loan forgiveness or otherwise discharge their loans. In other words, Defendants are incentivized to keep loans active for as long as possible to continue earning servicing fees. From Defendants' perspective, every time a borrower repays her loan in full, or receives loan forgiveness, Defendants lose a loan from their servicing portfolio, a vital source of their revenue.

38.     Similarly, Defendants' improper servicing of accounts on which borrowers have made Excess Payments has resulted, and will continue to result, in the DOE paying excessive fees beyond those it would be required to pay if Defendants' properly and legally applied borrowers' Excess Payments.

### B.     The Presidential Memorandum

39.     In 2015, President Barack Obama signed a Presidential Memorandum of the Student Aid Bill of Rights ("Presidential Memorandum") calling on several federal agencies to work together to strengthen student loan servicing and improve borrower outcomes on a host of different measures including directing "all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers."[2]  Excess Payments are deemed prepayments under federal law.  34 C.F.R. § 685.211(a)(2).  The Presidential Memorandum directed the Secretary of Education to require servicers to apply Excess Payments as directed "as soon as practicable," but

---

[2] https://www.federalregister.gov/documents/2015/03/13/2015-05933/student-aid-bill-of-rights-to-help-ensure-affordable-loan-repayment.

no later than January 1, 2016.  Presidential Memorandum, § 2(a).

40.    Thus, since January 1, 2016 at the latest, federal law has required Defendants to apply Excess Payments first to a borrower's highest interest rate loan.

**C.    State Law Governing Student Loan Servicers**

41.    The Servicing Contracts described above require all servicers to "be responsible for maintaining a full understanding of all federal <u>and state laws</u> and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur." (emphasis added).

42.    Many states have enacted laws protecting student loan borrowers from predatory practices of student loan servicers.

43.    In 2019, the New Jersey legislature passed a student loan borrower bill of rights prohibiting student loan servicers from:

a.   Directly or indirectly employing any scheme, device or artifice to defraud or mislead student loan borrowers;

b.   Engaging in any unfair or deceptive practice toward any person or misrepresent or omit any material information in connection with the servicing of a student education loan, including, but not limited to, misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a student education loan, the terms and conditions of the loan agreement or the borrower's obligations under the loan;

c.   Obtaining property by fraud or misrepresentation; and

d.   Misapplying student education loan payments to the outstanding balance of a student education loan.

S. 1149 (NJ, 2019).

44. The New Jersey Consumer Fraud Act also prohibits:

> The act, use of employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that other rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J.S.A. § 56:8-2.

**D.     COVID-19 and the 2020 Administrative Forbearance**

45.     On March 11, 2020, a novel virus identified as COVID-19 was declared a global pandemic.

46.     In response to the devasting financial impact caused by the COVID-19 pandemic, Congress afforded relief to federal student loan borrowers under the CARES Act.[3]

47.     Specifically, the CARES act suspended all payments due for federal student loans held by the DOE from March 13, 2020 to September 30, 2020 and directed that "interest shall not accrue on a loan described under subsection (a) for which payment was suspended for the period of the suspension."[4]

48.     This suspension of payments and interest went into effect automatically. Borrowers were not required to make any request or demonstrate any adverse impact related to the COVID-19 pandemic to obtain this relief.

49.     On August 8, 2020, President Donald Trump signed a Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic and ordered

---

[3] H.R. 748, Public Law 116-136.
[4] *Id.* at §§ 3515(a) & (b).

"continu[ing] the temporary cessation of payments and the waiver of all interest on student loans held by the Department of Education until December 31, 2020."[5]

50.    This executive order clarified that "[a]ll persons who wish to continue making student loan payments shall be allowed to do so…"[6]

51.    On December 4, 2020, Secretary of Education Betsy DeVos announced the extension of the federal student loan administrative forbearance period, the pause in interest accrual, and the suspension of collections activity through January 31, 2021.

52.    In her announcement, she advised that: "Federal student loan borrowers will not be expected to make payments through January of next year, though they will continue to be able to do so and benefit from the 0% interest rate as they pay down principal."

53.    Forbearance is defined under 34 CFR § 685.205(a) as follows:

> "Forbearance" means permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled.

54.    The Servicing Contracts also define "Borrowers in Forbearance" in Attachment A-6 as "unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and would have had a payment due this month, but the payment was replaced with a forbearance."

55.    34 CFR § 685.205(b)(8) authorizes "administrative forbearance" which permits "the Secretary [to] grant[ ] forbearance without requiring documentation from the borrower…[due to a] local or national emergency."

56.    Similar language appears on the standard form Master Promissory Notes (herein

---

[5] https://www.whitehouse.gov/presidential-actions/memorandum-continued-student-loan-payment-relief-covid-19-pandemic/.
[6] *Id.*

referred to as "Promissory Notes") issued by the DOE and signed by borrowers who take out federally held student loans.[7]

57.     For example, the standard form Promissory Notes state:

> Under certain circumstances, we [the Department of Education] may also give you a forbearance without requiring you to submit a request or documentation.

58.      It also indicates that "[a]llowing [a borrower] to temporarily delay or reduce loan payments is called 'forbearance'".

59.     On the Federal Student Aid website, there is a page titled "Coronavirus and Forbearance Info for Student, Borrowers, and Parents".  On the webpage, it is indicated that during the administrative forbearance, the full amount of any payments made will be applied to principal once all the interest that accrued prior to March 13 is paid.

60.     The webpage further advises borrowers that "[c]ontinuing to make payments between March 13, 2020, and Dec. 31, 2020, could help you pay down your loan balance more quickly because the fully amount of a payment will be applied to principal once all interest accrued prior to March 13, 2020, is paid."

61.     Great Lakes' website has a page titled "Important Coronavirus (COVID-19) Information".  On the webpage, it provides a link to the aforementioned Federal Student Aid website titled "Coronavirus and Forbearance Info for Student, Borrowers, and Parents."

62.     On the Great Lakes webpage titled "Important Coronavirus (COVID-19) Information", Great Lakes advises its borrowers that "**If you wish to continue making**

---

[7] The Promissory Notes are the student loan contracts that govern the rights and responsibilities of lender and borrower. The lender for every direct loan is the DOE. For FFEL loans purchased by the DOE, the DOE—as owner of the FFEL loan—assumes the rights and responsibilities of the original FFEL lender. Every other FFEL loan is owned either by the original FFEL lender or by some other non-DOE entity that purchased the FFEL loan after origination.

**payments,** to save money in the long run, you can make payments anytime during the COVID-19-related administrative forbearance." (emphasis in original).

63.     On August 30, 2020, an e-mail was sent out by Great Lakes to all borrowers advising them that "[i]f you can continue paying your student loans while your loans are at 0% interest rate, your payments go farther toward reducing the principal balance of your loan amount once any outstanding interest has been paid."

64.     On the Nelnet website, there is a page titled "Important Coronavirus (COVID-19) Information."  On the webpage, it provides a link to the aforementioned Federal Student Aid website titled "Coronavirus and Forbearance Info for Student, Borrowers, and Parents."

65.     The Nelnet webpage titled "Important Coronavirus (COVID-19) Information," Great Lakes advises its borrowers that "**If you wish to continue making payments,** to save money in the long run, you can make payments anytime during the COVID-19-related administrative forbearance." (emphasis in original).

> **E.     Defendants Violate Federal Law, State Laws, and Loan Terms While Taking Advantage Of The National Health Emergency**

66.      During the administrative forbearance, no payments are due from borrowers, and interest is temporarily set to 0% for all federal student loans.

67.     However, those federal student loans, while temporarily set to 0% interest, will return to their originally assigned interest rates on February 1, 2021.

68.     Therefore, for any borrowers who choose to take the explicit advice from the Defendants and the DOE to make payments during the administrative forbearance to pay down the principal of their loans, it is in their best interest for those payments to be applied to the principal of the loans with the highest interest rates.

69.     This is consistent with federal law requiring servicers to allocate Excess Payments

to loans with the highest interest rates.[8]

70.     Great Lakes' website defines an "excess payment" as "any amount above your total amount due or your minimum scheduled monthly payment for an account, whichever is greater."

71.     Great Lakes' website further indicates that, consistent with the federal law, the standard and default allocation for excess payments is to apply those payments to the loan with the highest interest rate, "thus costing you less interest over time."

**72.**     The Great Lakes website further clarifies that "[f]or loans in forbearance, any amount that goes to principal will be **applied to the highest interest rate loans**, regardless of subsidy." **(emphasis added).**

73.     The Nelnet website indicates that if you pay more than your current amount due:

> [T]he standard allocation method is as follows.  After your current amount due is paid, payments are allocated across loans in repayment status **starting with the highest interest rate.**  Once the loans in repayment status with the highest interest rate are paid in full, any remaining payment amount will be allocated across the loans with the next highest interest rate.  If two or more loans in repayment status have the same highest interest rate, the payment will be allocated first to the unsubsidized loans and then to the subsidized loans, in proportion to each loan's regular monthly payment amount.  (emphasis added)

74.     The Nelnet website further clarifies that the payment allocation for loans not in repayment status (i.e. forbearance):

> [T]he standard allocation method is as follows.  If none of your loans are in repayment status, payments are first allocated to outstanding interest and fees (if applicable)* **beginning with loans with the highest interest rate**, unless the payment is made within 120 days of disbursement (see below).  Once all outstanding interest and fees (if applicable)* have been paid on the loans not in repayment status, remaining payments will be allocated across unsubsidized loans and then subsidized loans starting with

---

[8] https://www.federalregister.gov/documents/2015/03/13/2015-05933/student-aid-bill-of-rights-to-help-ensure-affordable-loan-repayment.

loans that have the highest interest rates. (emphasis added)

75.     During the administrative forbearance, borrowers do not have independent access to the originally assigned interest rates of their loans through the servicers' websites.

76.     During the administrative forbearance, borrowers do not owe any money on their federal student loans, so any money paid during the administrative forbearance is an Excess Payment.

77.     As an Excess Payment, any money paid during the administrative forbearance should be allocated to the loans with the highest interest rates, regardless of subsidy.

78.     When Plaintiffs, and any other borrower of federal student loans serviced by Great Lakes and/or Nelnet made any payment from at least March 13, 2020 to the present, instead of following federal law, and instead of honoring the explicit promise on its website to allocate payments to the loans with the highest interest rates, Great Lakes and/or Nelnet has misallocated and continues to misallocate these payments proportionally across loans without consideration of interest rates.

79.     A Great Lakes representative admitted to a student loan borrower, in an email, that:

> During the Administrative Forbearance, the interest rates for [borrowers] loans are not taken into consideration.  This is because they have all been lowered to 0.00%.  The payments received, after paying off any accrued interest, would be prorated amongst all of your Unsubsidized loans, based on the outstanding principal balance only.

E-Mail attached hereto as Exhibit B.

80.     This prohibited method of payment allocation is a detriment to federal student loan borrowers, who will realize the interest on those high interest loans after the administrative forbearance ends, and who have now been deprived of an opportunity to more rapidly pay down

or potentially pay off those higher interest loans.

81.     This is in direct violation of federal law, as established by the Presidential

Memorandum, and is contrary to the explicit promises on Defendants' websites.  Given that

these promises were not followed by Defendants, they constitute misrepresentations.

82.     Defendants misrepresentations and misallocation of borrower Excess Payments

also violate various state laws protecting student loan borrowers, including but not limited to the

New Jersey Student Loan Borrower Bill of Rights, S. 1149 (NJ, 2019), and New Jersey

Consumer Fraud Act, N.J.S.A. § 56:8-2.

> **F.     Plaintiff Specific Examples of Payment Misallocation**

83.     Defendant has misallocated and continues to misallocate payments made by

student loan borrowers such as Plaintiffs since at least March 13, 2020.

84.     Plaintiff Sienna Lyons has multiple federal student loans serviced by Defendants

with different interest rates.

85.     Plaintiff Sienna Lyons made a payment on July 23, 2020 to Defendants in the

amount of $2,400.00.

86.     Plaintiff Sienna Lyons's July payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post- Administrative Forbearance |
|---|---|---|---|---|
| 819 Unsubsidized | $381.31 | $12.04 | $5,228.36 | 6.80% |
| 821 Unsubsidized | $424.37 | $13.41 | $5,820.13 | 6.80% |
| 823 Unsubsidized | $461.61 | $14.59 | $6,329.72 | 6.80% |
| 825 Unsubsidized | $218.12 | $6.89 | $2,991.00 | 6.80% |
| 829 Unsubsidized | $333.35 | $7.09 | $4,569.64 | 4.66% |

| 830 Subsidized | $0.00 | $5.20 | $3,591.61 | 4.29% |
| 831 Unsubsidized | $340.80 | $7.25 | $4,674.67 | 4.29% |
| 832 Subsidized | $0.00 | $2.39 | $1,795.80 | 3.76% |
| 833 Unsubsidized | $168.30 | $3.28 | $2,307.90 | 3.76% |

87.     Plaintiff Sienna Lyons made a payment on August 4, 2020 to Defendants in the amount of $600.00.

88.     Plaintiff Sienna Lyons's August payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post- Administrative Forbearance |
|---|---|---|---|---|
| 819 Unsubsidized | $98.28 | $0.00 | $5,130.08 | 6.80% |
| 821 Unsubsidized | $109.38 | $0.00 | $5,710.75 | 6.80% |
| 823 Unsubsidized | $118.98 | $0.00 | $6,210.74 | 6.80% |
| 825 Unsubsidized | $56.22 | $0.00 | $2,934.78 | 6.80% |
| 829 Unsubsidized | $85.92 | $0.00 | $4,483.72 | 4.66% |
| 830 Subsidized | $0.00 | $0.00 | $3,591.61 | 4.29% |
| 831 Unsubsidized | $87.84 | $0.00 | $4,586.83 | 4.29% |
| 832 Subsidized | $0.00 | $0.00 | $1,795.80 | 3.76% |
| 833 Unsubsidized | $43.38 | $0.00 | $2,264.52 | 3.76% |

89.     Plaintiff Sienna Lyons made a payment on September 11, 2020 to Defendants in the amount of $600.00.

90.     Plaintiff Sienna Lyons's September payment was allocated by Defendants as

follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
|---|---|---|---|---|
| 819 Unsubsidized | $98.28 | $0.00 | $5,031.80 | 6.80% |
| 821 Unsubsidized | $109.38 | $0.00 | $5,601.37 | 6.80% |
| 823 Unsubsidized | $118.98 | $0.00 | $6,091.76 | 6.80% |
| 825 Unsubsidized | $56.22 | $0.00 | $2,878.56 | 6.80% |
| 829 Unsubsidized | $85.92 | $0.00 | $4,397.80 | 4.66% |
| 830 Subsidized | $0.00 | $0.00 | $3,591.61 | 4.29% |
| 831 Unsubsidized | $87.84 | $0.00 | $4,498.99 | 4.29% |
| 832 Subsidized | $0.00 | $0.00 | $1,795.80 | 3.76% |
| 833 Unsubsidized | $43.38 | $0.00 | $2,221.14 | 3.76% |

91.     Plaintiff Sienna Lyons's July, August, and September payments were not allocated to her highest interest loans.

92.     Instead, Plaintiff Sienna Lyons's July, August, and September payments were allocated proportionally among the principals of her unsubsidized loans only, after her outstanding interest was satisfied, without regard to interest rate.[9]

93.     This payment allocation is in direct violation of the federal law, state law, and the explicit promise on Defendants' websites.

---

[9] An unsubsidized loan is a loan whereby interest begins accruing as soon as the loan is disbursed.  A subsidized loan is a loan whereby the Department of Education pays the interest once the loan is disbursed while the borrower is enrolled at least halftime in college. Once a borrower is no longer enrolled at least halftime in college, the unsubsidized versus subsidized status of a loan is irrelevant.

94.     Plaintiff Danielle LaBella has multiple federal student loans serviced by Defendants with different interest rates.

95.     Plaintiff Danielle LaBella made a payment on March 31, 2020 to Defendants in the amount of $300.00.

96.     Plaintiff Daniella LaBella's March payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
|---|---|---|---|---|
| 227 Subsidized | $0.00 | $3.34 | $2,881.94 | 3.860% |
| 228 Unsubsidized | $73.75 | $2.17 | $1,794.45 | 3.860% |
| 229 Subsidized | $0.00 | $3.96 | $2,826.64 | 4.660% |
| 230 Unsubsidized | $63.91 | $2.27 | $1,554.66 | 4.660% |
| 231 Subsidized | $0.00 | $5.72 | $4,441.77 | 4.290% |
| 232 Unsubsidized | $69.41 | $2.27 | $1,688.59 | 4.290% |
| 233 Subsidized | $0.00 | $5.01 | $4,441.77 | 3.760% |
| 234 Unsubsidized | $66.29 | $1.90 | $1,612.62 | 3.760% |

97.     Plaintiff Danielle LaBella made a payment on May 4, 2020 to Defendants in the amount of $300.00.

98.     Plaintiff Danielle LaBella's May payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
|---|---|---|---|---|

| 227 Subsidized | $0.00 | $0.00 | $2,881.94 | 3.860% |
|---|---|---|---|---|
| 228 Unsubsidized | $80.94 | $0.00 | $1,713.51 | 3.860% |
| 229 Subsidized | $0.00 | $0.00 | $2,826.64 | 4.660% |
| 230 Unsubsidized | $70.14 | $0.00 | $1,484.52 | 4.660% |
| 231 Subsidized | $0.00 | $0.00 | $4,441.77 | 4.290% |
| 232 Unsubsidized | $76.17 | $0.00 | $1,612.42 | 4.290% |
| 233 Subsidized | $0.00 | $0.00 | $4,441.77 | 3.760% |
| 234 Unsubsidized | $72.75 | $0.00 | $1,539.87 | 3.760% |

99.     Plaintiff Danielle LaBella made a payment on June 3, 2020 to Defendants in the amount of $300.00.

100.    Plaintiff Danielle LaBella's June payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
|---|---|---|---|---|
| 227 Subsidized | $0.00 | $0.00 | $2,881.94 | 3.860% |
| 228 Unsubsidized | $80.94 | $0.00 | $1,632.57 | 3.860% |
| 229 Subsidized | $0.00 | $0.00 | $2,826.64 | 4.660% |
| 230 Unsubsidized | $70.14 | $0.00 | $1,414.38 | 4.660% |
| 231 Subsidized | $0.00 | $0.00 | $4,441.77 | 4.290% |
| 232 Unsubsidized | $76.17 | $0.00 | $1,536.25 | 4.290% |
| 233 Subsidized | $0.00 | $0.00 | $4,441.77 | 3.760% |
| 234 Unsubsidized | $72.75 | $0.00 | $1,467.12 | 3.760% |

101.    Plaintiff Danielle LaBella made a payment on July 3, 2020 to Defendants in the amount of $300.00.

102.    Plaintiff Danielle LaBella's July payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post- Administrative Forbearance |
|---|---|---|---|---|
| 227 Subsidized | $0.00 | $0.00 | $2,881.94 | 3.860% |
| 228 Unsubsidized | $80.94 | $0.00 | $1,551.63 | 3.860% |
| 229 Subsidized | $0.00 | $0.00 | $2,826.64 | 4.660% |
| 230 Unsubsidized | $70.14 | $0.00 | $1,344.24 | 4.660% |
| 231 Subsidized | $0.00 | $0.00 | $4,441.77 | 4.290% |
| 232 Unsubsidized | $76.17 | $0.00 | $1,460.08 | 4.290% |
| 233 Subsidized | $0.00 | $0.00 | $4,441.77 | 3.760% |
| 234 Unsubsidized | $72.75 | $0.00 | $1,394.37 | 3.760% |

103.    Plaintiff Danielle LaBella made a payment on August 3, 2020 to Defendants in the amount of $350.00.

104.    Plaintiff Danielle LaBella's August payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post- Administrative Forbearance |
|---|---|---|---|---|
| 227 Subsidized | $0.00 | $0.00 | $2,881.94 | 3.860% |
| 228 Unsubsidized | $94.42 | $0.00 | $1,457.21 | 3.860% |

| 229 Subsidized | $0.00 | $0.00 | $2,826.64 | 4.660% |
| 230 Unsubsidized | $81.83 | $0.00 | $1,262.41 | 4.660% |
| 231 Subsidized | $0.00 | $0.00 | $4,441.77 | 4.290% |
| 232 Unsubsidized | $88.87 | $0.00 | $1,371.21 | 4.290% |
| 233 Subsidized | $0.00 | $0.00 | $4,441.77 | 3.760% |
| 234 Unsubsidized | $84.88 | $0.00 | $1,309.49 | 3.760% |

105. Plaintiff Danielle LaBella made a payment on September 2, 2020 to Defendants in the amount of $300.00.

106. Plaintiff Danielle LaBella's September payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
| --- | --- | --- | --- | --- |
| 227 Subsidized | $0.00 | $0.00 | $2,881.94 | 3.860% |
| 228 Unsubsidized | $80.94 | $0.00 | $1,376.27 | 3.860% |
| 229 Subsidized | $0.00 | $0.00 | $2,826.64 | 4.660% |
| 230 Unsubsidized | $70.14 | $0.00 | $1,192.27 | 4.660% |
| 231 Subsidized | $0.00 | $0.00 | $4,441.77 | 4.290% |
| 232 Unsubsidized | $76.17 | $0.00 | $1,295.04 | 4.290% |
| 233 Subsidized | $0.00 | $0.00 | $4,441.77 | 3.760% |
| 234 Unsubsidized | $72.75 | $0.00 | $1,236.74 | 3.760% |

107. Plaintiff Danielle LaBella's March, May, June, July, August, and September

payments were not allocated to her highest interest loans.

108.    Instead, Danielle LaBella's March, May, June, July, August, and September payments were allocated proportionally among the principals of her unsubsidized loans only, after her outstanding interest was satisfied, without regard to interest rate.

109.    This payment allocation is in direct violation of the federal law, state law, and the explicit promise on Defendants' websites.

110.    Plaintiff Saundra O'Donnell has multiple federal student loans serviced by Defendants with different interest rates.

111.    Plaintiff Sandra O'Donnell made a payment on April 7, 2020 to Defendants in the amount of $1,500.00.

112.    Plaintiff Saundra O'Donnell's April payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post- Administrative Forbearance |
|---|---|---|---|---|
| 229 Unsubsidized | $497.22 | $96.64 | $63,027.04 | 7.210% |
| 231 Unsubsidized | $402.44 | $74.05 | $51,011.40 | 6.840% |
| 233 Unsubsidized | $367.47 | $62.18 | $46,575.05 | 6.310% |

113.    Plaintiff Sandra O'Donnell made a payment on May 7, 2020 to Defendants in the amount of $1,500.00.

114.    Plaintiff Saundra O'Donnell's June payment was allocated by Defendants as follows:

| Loan Token # & Subsidy | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post- |
|---|---|---|---|---|

| Status | | | | Administrative Forbearance |
| --- | --- | --- | --- | --- |
| 229 Unsubsidized | $588.60 | $0.00 | $62,438.44 | 7.210% |
| 231 Unsubsidized | $476.40 | $0.00 | $50,535.00 | 6.840% |
| 233 Unsubsidized | $435.00 | $0.00 | $46,140.05 | 6.310% |

115.    Plaintiff Saundra O'Donnell made a payment on June 19, 2020 to Defendants in the amount of $1,500.00.

116.    Plaintiff Saundra O'Donnell's June payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
| --- | --- | --- | --- | --- |
| 229 Unsubsidized | $588.60 | $0.00 | $61,849.84 | 7.210% |
| 231 Unsubsidized | $476.40 | $0.00 | $50,058.60 | 6.840% |
| 233 Unsubsidized | $435.00 | $0.00 | $45,705.05 | 6.310% |

117.    Plaintiff Saundra O'Donnell made a payment on July 8, 2020 to Defendants in the amount of $1,500.00.

118.    Plaintiff Saundra O'Donnell's June payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
| --- | --- | --- | --- | --- |
| 229 Unsubsidized | $588.60 | $0.00 | $61,261.24 | 7.210% |
| 231 Unsubsidized | $476.40 | $0.00 | $49,582.20 | 6.840% |

| 233 Unsubsidized | $435.00 | $0.00 | $45,270.05 | 6.310% |
|---|---|---|---|---|

119.   Plaintiff Saundra O'Donnell made a payment on August 24, 2020 to Defendants in the amount of $973.00.

120.   Plaintiff Saundra O'Donnell's August payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
|---|---|---|---|---|
| 229 Unsubsidized | $381.81 | $0.00 | $60,879.43 | 7.210% |
| 231 Unsubsidized | $309.02 | $0.00 | $49,273.18 | 6.840% |
| 233 Unsubsidized | $282.17 | $0.00 | $44,987.88 | 6.310% |

121.   Plaintiff Saundra O'Donnell made a payment on September 9, 2020 to Defendants in the amount of $973.00.

122.   Plaintiff Saundra O'Donnell's September payment was allocated by Defendants as follows:

| Loan Token # & Subsidy Status | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Pre- and Post-Administrative Forbearance |
|---|---|---|---|---|
| 229 Unsubsidized | $381.81 | $0.00 | $60,497.62 | 7.210% |
| 231 Unsubsidized | $309.02 | $0.00 | $48,964.16 | 6.840% |
| 233 Unsubsidized | $282.17 | $0.00 | $44,705.71 | 6.310% |

123.   Plaintiff Saundra O'Donnell's April, May, June, July, August and September

payments were not allocated to her highest interest loans.

124.    Instead, Saundra O'Donnell's April, May, June, July, August and September payments were allocated proportionally among the principals of her unsubsidized loans only, after her outstanding interest was satisfied, without regard to interest rate.

125.    This payment allocation is in direct violation of the federal law, state law, and the explicit promise on Defendants' websites.

## CLASS ACTION ALLEGATIONS

126.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class defined as:

> All individuals with more than one federal student loan with two or more different interest rates serviced by Defendants who made payments at any time between March 13, 2020 and the present (the "Class Period"), and who did not select a custom payment allocation.

127.    Additionally, Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Subclass defined as:

> All individuals with more than one federal student loan with two or more different interest rates serviced by Defendants who made payments at any time between March 13, 2020 and the present (the "Class Period"), and who did not select a custom payment allocation, and who are residents of the State of New Jersey.

128.    Excluded from the Class and Subclass are: (a) Defendants, including any entity in which Defendants have a controlling interest, and its representatives, officers, directors, employees, assigns and successors; and (b) the Judge to whom this case is assigned.

129.    Plaintiffs are members of the Class and Subclass they seek to represent. Members of the proposed Class and Subclass are fully ascertainable and can be identified using

Defendants' records, other information kept by Defendants in the usual course of business, and/or other documents that are obtained through reasonable means. Class and Subclass Members can be notified of the class action through publication on Internet forums and websites as well as direct mailings or e-mailings to address lists maintained by Defendants or otherwise obtained through reasonable means.

130.   Numerosity/Impracticability of Joinder:  The members of the Class and Subclass number in at least the tens of thousands, and potentially the millions, and are therefore so numerous that joinder of all members would be impracticable.  The precise number of Class and Subclass Members can be ascertained by reviewing documents and records in Defendants' possession, custody, and control, or otherwise obtained through reasonable means.

131.   Commonality and Predominance:  There are common questions of law or fact which predominate over any questions affecting only individual members of the Class and Subclass.  These common legal or factual questions, include, but are not limited to the following:

a.   Whether, during the Class Period, Defendants have had a common practice of misallocating payments such that they are made proportionally without consideration of interest rates;

b.   Whether Defendants' conduct violated state or federal law, and if so, whether such violations gave rise to a cause of action under the Servicing Contract;

c.   Whether Defendants' conduct violated state or federal law, and if so, whether such violations gave rise to a cause of action under the standard form Promissory Notes;

d.   Whether Defendants violated the terms of the standard form Promissory Notes governing direct and FFEL loans;

e.     Whether Defendants' conduct constituted a breach of, and/or tortious interference with, the standard form Promissory Notes of Plaintiffs;

f.     Whether Defendants' common practice of allocation of payments without consideration of interest rates violates federal law;

g.     Whether Defendants' common practice of allocating payments without consideration of interest rates violates state law, including the New Jersey Student Borrower Bill of Rights; and

h.     The extent to which Class and Subclass Members have sustained damages and the proper measure thereof.

132.    <u>Typicality</u>:  The representative Plaintiffs' claims are typical of the claims of the members of the Class and Subclass they seek to represent.  Plaintiffs and members of the Class and Subclass have been injured by the same wrongful practices in which Defendants have engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and Subclass and are based on the same legal theories.

133.    <u>Adequacy</u>:  Plaintiffs will fully and adequately assert and protect the interests of the Class and Subclass, and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiffs nor their attorneys have any interests which are contrary to or conflict with the Class and Subclass.

134.    <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class and Subclass Members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class and Subclass member resulting from Defendant's wrongful

28

conduct are too small to warrant the expense of individual suits.  The likelihood of individual

Class and Subclass members prosecuting their own separate claims is remote, and, even if every

Class and Subclass member could afford individual litigation, the court system would be unduly

burdened by individual litigation of such cases. Individual members of the Class and Subclass do

not have a significant interest in individually controlling the prosecution of separate actions, and

individualized litigation would also present the potential for varying, inconsistent, or

contradictory judgments and would magnify the delay and expense to all of the parties and to the

court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no

difficulty to be encountered in the management of this action that would preclude its

maintenance as a class action.

## COUNT I
### Breach Of The Servicing Contract

135.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

136.    On June 17, 2009, Great Lakes entered into a Servicing Contract with the

Department of Education, which is attached hereto as Exhibit A.

137.    On June 17, 2009, Nelnet Servicing LLC entered into a Servicing Contract with

the Department of Education, which is attached hereto as Exhibit A. Nelnet Servicing LLC was a

known agent of Nelnet Diversified Solutions LLC, and Nelnet Inc. – its disclosed principals –

and was acting as their agent when it entered into the Servicing Contract. Thus, Nelnet Inc. and

Nelnet Diversified Solutions LLC are liable under the Servicing Contract. Because Nelnet

Servicing LLC executed the contract in its own name, it is also liable under the Servicing

Contract.

138.    At all relevant times, Plaintiffs and members of the Class and Subclass were

intended third- party beneficiaries of the Servicing Contracts.

139.    Pursuant to the terms of the Servicing Contracts, Defendants agreed to comply with all applicable federal and state law.

140.    As set forth above, Defendants materially breached the Servicing Contracts by failing to administer Plaintiffs' loans in accordance with federal law and state law.

141.    When Plaintiffs and members of the Class and Subclass made any payment from March 13, 2020 to the present, instead of following federal and state law, and instead of honoring their explicit promises on their websites to allocate payments to the loans with the highest interest rates, Defendants misallocated and continue to misallocate these payments proportionally without consideration of interest rates.

142.    This payment allocation is a detriment to Plaintiffs and members of the Class and Subclass, who will incur the interest on those high interest loans after the administrative forbearance ends, and who have now been deprived of an opportunity to pay down or potentially pay off those higher interest loans at a faster rate.

143.    As a direct and proximate result of Defendants' breach of the Servicing Contracts, Plaintiffs and members of the Class and Subclass have suffered the same damages, including, but not limited to (i) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (ii) the financial harm associated with lost progress towards loan payoff.

144.    Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the Servicing Contracts, it nonetheless constituted a breach of the covenant of good faith and fair dealing implied therein, causing the damages sought.

145.    Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing.

146.    A party to a contract breaches the implied covenant of good faith and fair dealing when it acts in bad faith or engages in some other form of inequitable conduct that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

147.    Defendants owed Plaintiffs and Class and Subclass members a duty of good faith and fair dealing at all times during the existence of the Servicing Contracts and while servicing their loans.

148.    Defendants purposefully, in bad faith, and without regard to the rights of Plaintiffs and the Class and Subclass, failed to follow federal and state law, and instead of honoring their explicit promise on their websites to allocate payments to the loans with the highest interest rates, Defendants intentionally misallocated and continue to misallocate these payments proportionally without consideration of interest rates.

149.    Defendants' actions breached the express terms of the Servicing Contracts and were unreasonable and arbitrary.

150.    Defendants breached the covenant of good faith and fair dealing with the aforementioned conduct.

151.    Defendants' breach of the obligation of good faith and fair dealing caused Plaintiffs and Class and Subclass members to incur damages as set forth herein.

## COUNT II
### Breach of the Promissory Note

152.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

153.    By entering into the Servicing Contracts with the Department of Education, Defendants accepted a delegation of the loan servicing obligations set forth in Plaintiffs' Promissory Notes, and became assignees thereof.  Thus, at all relevant times, Plaintiffs and members of the Class and Subclass were in a contractual relationship with Defendants.

154.   The Promissory Notes required Defendants to service the loans of Plaintiffs in accordance with federal and state law.

155.   As set forth above, Defendants materially breached the Promissory Notes by failing to administer Plaintiffs' loans in accordance with federal and state law.

156.   As a direct and proximate result of Defendants' material breach of the Promissory Note, Plaintiffs and members of the Class and Subclass have suffered damages, including, but not limited to (i) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (ii) the financial harm associated with lost progress towards loan payoff.

157.   Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the Promissory Note, it nonetheless constituted a breach of the covenant of good faith and fair dealing implied therein, causing the damages sought.

158.   Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing.

159.   A party to a contract breaches the implied covenant of good faith and fair dealing when it acts in bad faith or engages in some other form of inequitable conduct that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

160.   Defendants owed Plaintiffs and class and Subclass members a duty of good faith and fair dealing at all times during the existence of the Promissory Notes and while servicing their loans.

161.   Defendants purposefully, in bad faith, and without regard to the rights of Plaintiffs and the Class and Subclass, failed to follow federal law, state law, and instead of honoring their explicit promise on their websites to allocate payments to the loans with the highest interest

rates, Defendants intentionally misallocated and continue to misallocate these payments proportionally without consideration of interest rates.

162.    Defendants' actions breached the express terms of the Promissory Notes and were unreasonable and arbitrary.

163.    Defendants breached the covenant of good faith and fair dealing with the aforementioned conduct.

164.    Defendants' breach of the obligation of good faith and fair dealing caused Plaintiffs and class and Subclass members to incur damages as set forth herein.

## COUNT III
### Tortious Interference with a Business Relationship

165.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

166.    Plaintiffs and members of the Class and Subclass entered into a Promissory Note with DOE, thereby creating a business relationship between the parties of borrower and lender/guarantor.

167.    The shared goal and expectancy of the parties was to ensure an affordable means of financing the higher educations of the borrowers in accordance with federal law.

168.    Defendants had knowledge of the business relationship and the expectancy of the parties.

169.    Defendants knowingly interfered with the expectancy of the parties by 1) preventing borrowers from making payments in accordance with federal law and state law; 2) unlawfully inflating the principal loan balance of borrowers; and 3) preventing borrowers from making progress toward loan forgiveness.

170.    Defendants' motive in interfering with the business relationship was the maximization of their own profits.

171.    As a direct and proximate result of Defendants' interference with the Promissory Note, Plaintiffs and members of the Class and Subclass have suffered damages, including, but not limited to (i) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (ii) the financial harm associated with lost progress towards loan payoff.

## COUNT IV
### Negligent Misrepresentation

172.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

173.    Defendants had a pecuniary interest in their transactions with Plaintiffs and the Class and Subclass Members because the servicing fees that Defendants receive under the Servicing Contract are a direct function of the borrowers' performance under the loans.

174.    In the course of their business dealings with Plaintiffs and Class and Subclass Members, Defendants wrongly supplied Plaintiffs and Class and Subclass Members with false information regarding the terms of their loans. Namely, Defendants falsely represented that any money paid during the administrative forbearance would be allocated to the loans with the highest interest rates, regardless of subsidy.

175.    Defendants intended that the aforementioned representations be relied upon by Plaintiffs and Class and Subclass Members, who did so rely when they made excess payments and took other actions at the direction of Defendants.

176.    Defendants therefore negligently made false and misleading misrepresentations of fact to Plaintiffs and the Class and Subclass, including false and misleading loan balances and false and misleading statements regarding interest capitalization.

177.    Plaintiffs and the Class and Subclass necessarily relied on such representations because Defendants are the primary source of information and point of contact for all

information regarding their student loans, including (without limitation) daily loan balances, which are calculated and provided to borrowers and lenders by Defendants. In fact, if Plaintiffs or Class and Subclass members attempt to contact their lender(s) regarding their loans, they are referred to their servicers, Defendants, for loan-related inquiries.

178.    Defendants failed to exercise reasonable care or competence in communicating critical information to Plaintiffs and the Class and Subclass Members regarding the repayment terms of their loans.

179.    Defendants are subject to liability for the pecuniary losses proximately caused to Plaintiffs and Class and Subclass Members as a result of their justifiable reliance on the incorrect information provided by Defendants.

## COUNT V
### Unjust Enrichment

180.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

181.    Defendants charge and receive fees from the federal government each time they service a borrower's student loans.

182.    By failing to follow federal and state law in how student loan borrowers' payments are allocated among multiple loans, Defendants are effectively prolonging the life of borrowers' federal student loans.  Thus, enabling them to both collect more interest over the life of the loan at the expense of the borrowers, and to charge and receive more fees from the federal government for additional services that would not have otherwise been required.

183.    Defendants have and will continue to receive money to which they were not entitled, retained possession of it, and in justice and fairness ought to be required to pay it back to Plaintiffs and Class and Subclass Members.

184.    It would be unjust to allow Defendants to be enriched by retaining the benefits they unjustly received under the circumstances set forth above. Plaintiffs seek judgment for disgorgement to Plaintiffs and Class and Subclass Members of all amounts which Defendants have wrongly received and retained, as a matter of justice and fairness.

## COUNT VI
### Declaratory Judgment And Injunctive Relief

185.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

186.    Defendants have a practice and policy of breaching the Servicing Contracts and Promissory Notes by intentionally misallocating and continuing to misallocate payments proportionally without consideration of interest rates, in direct violation of federal and state law, and the explicit promise on Defendants' websites.

187.    There is a serious and imminent risk and substantial likelihood of irreparable injury in the future to Plaintiffs and Class and Subclass Members if declaratory and injunctive relief is not granted.

188.    There is an inadequate remedy at law because it is impracticable for Plaintiffs and individual Class and Subclass Members to sue Defendants every time they breach the Servicing Contracts and Promissory Notes in violation of federal and state law.

189.    Irreparable injury will occur if declaratory and injunctive relief is not granted because Plaintiffs and individual Class and Subclass Members will not have the resources to litigate this issue on an individual basis every time Defendants fail to properly allocate excess payments, resulting in (i) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (ii) the financial harm associated with lost progress towards loan payoff.

190.    Defendants have acted and refused to act on grounds that apply generally to Plaintiffs and the Class and Subclass, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class and Subclass as a whole.

191.    Plaintiffs and the Class and Subclass Members are entitled to a declaratory judgment that federal law directs Defendants to apply overpayments first to loans bearing the highest interest rates.

192.    There is a bona fide, actual, present, and practical need for the declaration sought because Defendants' illegal conduct has harmed Plaintiffs and Class and Subclass Members, and will continue to harm other borrowers who in the future make overpayments to their loans during the forbearance period.

193.    The requested declaration deals with a present, ascertained, and ascertainable state of facts and a present controversy relating to Defendants' practices of refusing to apply overpayments first to loans bearing the highest interest rates.

194.    Plaintiffs and Class and Subclass Members are subject to a substantial and immediate threat of injury because Defendant continues to breach its Servicing Contracts and Promissory Notes relating to the allocation of overpayments, which should be applied first to loans bearing the highest interest rates.

## COUNT VII
**Negligence**

195.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

196.    Defendants owe a duty to the borrowers whose loans they service. Defendants' duty arises under the Servicing Contracts, Defendants' servicing contracts with non-Department FFEL lenders, and federal law governing all FFEL and Direct loans as well as student loan servicers. Defendants' duty includes, without limitation, the duty to service borrowers' loans in

accordance with federal and state law and to not misallocate overpayments during the forbearance period to prolong the life of the loan and increase interest accruals on a daily basis.

197.     Defendants have breached their duty to borrowers by failing to adhere to the plain terms of the Promissory Notes governing the loans it services and by misallocating payments made by borrowers in violation of federal law.

198.     Plaintiffs and the Class and Subclass have been harmed as a direct result of Defendants' breaches, by being failing to properly allocate excess payments, resulting in (i) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (ii) the financial harm associated with lost progress towards loan payoff.

## COUNT VIII
### Violation of New Jersey Consumer Fraud Act
### (Unconscionable Commercial Practices and Deception)

199.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

200.     The New Jersey CFA prohibits:

> The act, use of employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that other rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J.S.A. § 56:8-2.

201.     The New Jersey CFA defines "merchandise" as including "any objects, wares, good, commodities, services or anything offered, directly or indirectly to the public for sale."

N.J.S.A. § 56:8-1(c).

202.    At all relevant times, Defendants have been engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. § 56:8-1(c), including, but not limited to the services they provide to student borrowers.

203.    In the operation of their businesses, Defendants have engaged in the use of unconscionable commercial practices, deception, false promises, and/or misrepresentations.

204.    Defendants have engaged in unconscionable commercial practices including, but not limited to the following:

a.  Deceptively inducing borrowers to make payments during the administrative forbearance by making false and misleading statements regarding payment allocation;

b.  Misrepresenting how payments were being applied to Plaintiffs and Class and Subclass members' loans;

c.  Making false and misleading statements to Plaintiffs and Class and Subclass members regarding interest capitalization;

d.  Creating a likelihood of confusion or misunderstanding for Plaintiffs and Class and Subclass members as to their loan term information; and

e.  Purposefully failing to disclose critical information to Plaintiffs and the Class and Subclass Members regarding the repayment terms of their loans.

205.    Each unconscionable commercial practice by Defendants constitutes a separate violation under N.J.S.A. § 56:8-2.

### COUNT IX
### Violation of New Jersey Consumer Fraud Act
### (Misrepresentations)

206.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

207.    Defendants' conduct in violation of the New Jersey CFA includes, but is not limited to, the following acts of false promises and/or misrepresentations:

      a.    Misrepresenting how payments are being applied to Plaintiffs and Class and Subclass Members' loans;

      b.    Misrepresenting the benefits gained by making payments during the administrative forbearance; and

      c.    Misrepresenting critical loan information (such as interest rate) to Plaintiffs and Class and Subclass members.

208.    Each false promise and/or misrepresentation by Defendants constitutes a separate violation under N.J.S.A. § 56:8-2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class and Subclass Members pray for relief as set forth below:

A.    Certifying this action as a class action for the class identified above, pursuant to Fed. R. Civ. P. 23, declaring Plaintiffs as representatives of the Class and Subclass and Plaintiffs' counsel as counsel for the Class and Subclass;

B.    Awarding judgment to Plaintiffs and Class and Subclass Members for sums determined to be due from Defendants for their wrongful actions.

C.    Awarding taxable costs, compensatory and punitive damages to the extent permitted by law, and pre- and post-judgment interest and reasonable attorneys' fees and expenses to the extent permitted by law.

D.    Equitable relief in the form of restitution and/or disgorgement of all of Defendants' ill-gotten gains;

E.      Declaratory relief and an injunction against Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from, in any manner, continuing their unfair, unlawful, and deceptive practices;

F.      Treble damages pursuant to N.J.S.A. § 56:8-19; and

G.      All other relief to which Plaintiffs and Class and Subclass Members may be entitled at law or in equity.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all issues so triable.


                                        Respectfully submitted,

                                        **WILLIAMS CEDAR, LLC**

Dated: January 22, 2021                 */s David M. Cedar*
                                        David M. Cedar, Esq.
                                        */s Gerald J. Williams*
                                        Gerald J. Williams, Esq.
                                        8 Kings Highway West, Suite B
                                        Haddonfield, NJ 08033
                                        (856) 470-9777
                                        (888) 311 4899 fax
                                        dcedar@williamscedar.com
                                        gwilliams@williamscedar.com


                                        **AXLER GOLDICH LLC**

Dated: January 22, 2021                 */s Noah Axler*
                                        Noah Axler, Esq.
                                        */s Marc A. Goldich*
                                        Marc A. Goldich, Esq.

1520 Locust Street, Suite 301
Philadelphia, PA 19102
(267) 534-7400
(267) 534-7407 fax
naxler@axgolaw.com
mgoldich@axgolaw.com

<u>**Certification Pursuant to L. Civ. R. 11.2**</u>

Undersigned counsel certifies that the following actions are pending involving the

same subject matter of this controversy:

1. <u>The United States of America ex rel. Shauna Hlywiak v. Great Lakes, et al.</u>
   Case No.: 1:20-cv-13590

Undersigned counsel further certifies that there are no additional known parties

who should be joined to the present action at this time.

I certify the foregoing to be true and I am aware that if any of the above is

willfully false, I am subject to punishment.

**WILLIAMS CEDAR, LLC**

Dated: January 22, 2021

*/s David M. Cedar*
David M. Cedar, Esq.
*/s Gerald J. Williams*
Gerald J. Williams, Esq.
8 Kings Highway West, Suite B
Haddonfield, NJ 08033
(856) 470-9777
(888) 311 4899 fax
dcedar@williamscedar.com
gwilliams@williamscedar.com

**AXLER GOLDICH LLC**

Dated: January 22, 2021

*/s Noah Axler*
Noah Axler, Esq.
*/s Marc A. Goldich*
Marc A. Goldich, Esq.
1520 Locust Street, Suite 301
Philadelphia, PA 19102
(267) 534-7400
(267) 534-7407 fax
naxler@axgolaw.com
mgoldich@axgolaw.com
