# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SIENNA LYONS, *et al.*, | No. 1:21-cv-01047 |
| Plaintiffs, | |
| v. | **OPINION** |
| GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., *et al.*, | |
| Defendants. | |
| VICTORIA GALLAGHER, *et al.*, | No. 1:21-cv-01052 |
| Plaintiffs, | |
| v. | **OPINION** |
| NAVIENT CORPORATION, *et al.*, | |
| Defendants. | |
| GARY STROCKBINE, *et al.*, | No. 1:21-cv-09096 |
| Plaintiffs, | |
| v. | **OPINION** |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY a/k/a PHEAA d/b/a FEDLOAN SERVICING, | |
| Defendant. | |

<u>**APPEARANCES**</u>:

NOAH AXLER
Anderson Kill, P.C.
1760 Market St.
Suite 600
Philadelphia, PA 19103

DAVID M. CEDAR
Williams Cedar, LLC
8 Kings Highway West
Suite B
Haddonfield, NJ 08033

    *On behalf of Plaintiffs Sienna Lyons, Danielle Labella, Saundra O'Donnell, Victoria Gallagher, Megan O'Donnell, Gary Strockbine, Sean Maher, and Rachel Ann Philbin.*

JONATHAN SPELLS KRAUSE and
CORINNE SAMLER BRENNAN
Klehr Harrison Harvey Branzburg, LLP
1000 Lincoln Drive East
Suite 201
Marlton, NJ 08053

    *On behalf of Defendants Great Lakes Educational Loan Services, Inc., Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC, and Nelnet, Inc.*

DAVID G. MURPHY and
DIANE A. BETTINO
Reed Smith LLP
506 Carnegie Center
Suite 300
Princeton, NJ 08540

    *On behalf of Defendants Navient Corporation and Navient Solutions LLC.*

STEPHEN M. ORLOFSKY
Blank Rome LLP
300 Carnegie Center
Suite 220
Princeton, NJ 08540

BLAIR A. GEROLD
Blank Rome LLP
1 Logan Square
Philadelphia, PA 19103

    *On behalf of Defendant Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing.*

**O'HEARN, District Judge.**

Before the Court is the Joint Motion to Dismiss in three separately filed actions (Case No. 21-01047 ("*Lyons*"), ECF No. 33; Case No. 21-01052 ("*Gallagher*"), ECF No. 23; Case No. 21-09096 ("*Strockbine*"), ECF No. 11) by Defendants Navient Corporation and Navient Solutions LLC (collectively, "Navient"), Great Lakes Educational Loan Services, Inc. ("Great Lakes"), Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC, and Nelnet, Inc. (collectively, "Nelnet"), and Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing ("PHEAA," and together with Navient, Great Lakes, and Nelnet, the "Defendants") seeking to dismiss the Class Action Complaints (*Lyons*, ECF No. 1; *Gallagher*, ECF No. 1; *Strockbine*, ECF No. 1) filed by Sienna Lyons, Danielle Labella, Saundra O'Donnell (together, the "*Lyons* Plaintiffs"), Victoria Gallagher and Megan O'Donnell (together, the "*Gallagher* Plaintiffs"), and Gary Strockbine, Sean Maher, and Rachel Ann Philbin (the "*Strockbine* Plaintiffs," and together with the *Lyons* Plaintiffs and the *Gallagher* Plaintiffs, the "Plaintiffs").

The Court did not hear oral argument pursuant to Local Civil Rule 78.1. For the reasons discussed herein, the Court **GRANTS** the Joint Motion to Dismiss.

## I.     BACKGROUND

These cases are three separately-filed putative class actions brought by several federal student loan borrowers against multiple federal student loan servicers alleging that the loan servicers wrongfully allocated the Plaintiffs' payments made on their federal student loans after the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was passed in March 2020.

## A. Procedural Background

On January 22, 2021, the *Lyons* Plaintiffs filed a class action complaint (*Lyons*, ECF No. 1) (the "*Lyons* Complaint") against Defendants Great Lakes and Nelnet asserting claims for breach of contract, tortious interference with a business relationship, negligent misrepresentation, unjust enrichment, negligence, violations of the New Jersey Consumer Fraud Act (the "NJCFA") and seeking declaratory judgment and injunctive relief (herein referred to as the "*Lyons* Case").

On January 22, 2021, the *Gallagher* Plaintiffs filed a class action complaint (*Gallagher*, ECF No. 1) (the "*Gallagher* Complaint") asserting the same claims against the Navient Defendants (the "*Gallagher* Case") as were asserted in the *Lyons* Case.

On April 13, 2021, the *Strockbine* Plaintiffs filed a class action complaint (*Strockbine*, ECF No. 1) (the "*Strockbine* Complaint," and together with the *Lyons* Complaint and the *Gallagher* Complaint, the "Complaints") against PHEAA (the "*Strockbine* Case") asserting the same claims as those in the *Lyons* and *Gallagher* Cases, and also asserting claims for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL").

Given the overlapping allegations and issues presented in all three cases and the Defendants' expressed intention to each file a motion to dismiss in each case, the Court entered a briefing schedule (*Lyons*, ECF No. 28; *Gallagher*, ECF No. 22; *Strockbine*, ECF No. 7) whereby Defendants filed a Joint Motion to Dismiss (*Lyons*, ECF No. 33; *Gallagher*, ECF No. 23; *Strockbine*, ECF No. 11), and Plaintiffs filed a Joint Response in Opposition (*Lyons*, ECF No. 38; *Gallagher*, ECF No. 27; *Strockbine*, ECF No. 15), to which Defendants filed a Joint Reply (*Lyons*, ECF No. 41; *Gallagher*, ECF No. 30; *Strockbine*, ECF No. 16).[1]

---

[1] Because the allegations in the Complaints are substantially similar and the parties submitted joint briefings, all citations to the record will refer to the docket in the *Strockbine* Case (Case No. 21-09096), unless otherwise noted, to avoid lengthy citations to the records in all three cases.

In their Joint Motion to Dismiss, Defendants argue that the Complaints must be dismissed under Federal Rule of Civil Procedure ("Rule") 12(b)(1) because Plaintiffs lack Article III standing as they have not suffered an injury in fact, and therefore, this Court lacks subject matter jurisdiction. (ECF No. 11 at 9–22). Defendants also argue that Plaintiffs have failed to state cognizable claims under Rule 12(b)(6) (*id.* at 22–43) and moved to strike Plaintiffs' class allegations under Rule 12(f) and Rule 23(d)(1)(D) (*id.* at 44–50).

Having considered the parties' arguments, this Court concludes that Plaintiffs lack Article III standing to bring their claims, as they have not suffered an injury in fact, and any alleged future injury is too speculative to satisfy the jurisdictional requirements placed on this Court by Article III of the Constitution. Therefore, the Court dismisses the Complaints without prejudice.

### B.  Factual Background

#### 1.  Administration of the Federal Student Loan Program

Under the Higher Education Act ("HEA"), the U.S. Department of Education (the "DOE") has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1071–1099c. In the 1990s, the federal government began originating loans under the William D. Ford Direct Loan Program, *see* 20 U.S.C. §§ 1087a–1087j, and in 2008, the DOE began purchasing student loans from non-federal entities through the Federal Family Education Loan Program, *see* (ECF No. 1, ¶ 14). The Federal Student Aid ("FSA") office, a part of the DOE, is responsible for managing these and other federal loan programs authorized under the HEA. (*Id.*).

Congress directed the DOE to enter into contracts for the "servicing" of these federal loans and "such other aspects of the direct student loan program as the Secretary determines are necessary." 20 U.S.C. § 1087f. In 2009, the DOE awarded each Defendant a contract to service federal loans (the "Servicing Contracts") with five-year terms, each of which has been extended

numerous times. (ECF No. 1, ¶¶ 15–16, 22). The Servicing Contracts require the Defendants to correctly record the borrowers' interest rates, calculate borrowers' balances, and appropriately apply payments to borrowers' accounts, among other obligations. (*Id.*, ¶ 29). The DOE pays each Defendant a dynamic monthly servicing fee calculated based on a number of factors including the number of borrower accounts serviced by each Defendant and the repayment status of each borrower account. (*See id.*, ¶¶ 24–27, Ex. A, § B.13).

### 2. The CARES Act Places Federal Student Loans in Administrative Forbearance

In March 2020, in response to the COVID-19 pandemic, Congress passed the CARES Act, which granted temporary relief to federal student loan borrowers by placing their loans in administrative forbearance[2] until September 30, 2020, meaning that all payments due for certain student loans held by the DOE were suspended, interest on these loans would not accrue after March 13, 2020, and the interest rates on these loans were temporarily reduced to 0% (the "CARES Act Forbearance Period").[3] Before the CARES Act Forbearance Period expired on September 30, 2020, former President Trump directed the Secretary of Education to extend the administrative forbearance until December 31, 2020, by Presidential Memorandum.[4] Since that first extension,

---

[2] 34 C.F.R. § 685.205(a) (2020) ("'Forbearance' means permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled."); 34 C.F.R. § 685.205(b) (2020) ("Administrative forbearance. In certain circumstances, the Secretary grants forbearance without requiring documentation from the borrower . . . due to a . . . local or national emergency.").

[3] CARES Act, Pub. L. No. 116-136, 134 Stat. 281, §§ 3513(a)–(b) (20 U.S.C. § 1001 *et seq.*).

[4] Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic, 85 Fed. Reg. 49585 (Aug. 8, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000590/pdf/DCPD-202000590.pdf.

the CARES Act Forbearance Period has been extended several times, most recently until May 1, 2022.[5]

Because federal student loan borrowers are not required to make loan payments during the CARES Act Forbearance Period, these payments are considered "prepayments" under federal regulation, and are to be applied to repay a borrowers' federal student loans in the following manner: "first to any accrued charges and collection costs, then to any outstanding interest, and then to outstanding principal." 34 C.F.R. §§ 685.211(a)(1)–(2) (2014). Although this provision is clear about how a prepayment should be allocated on amounts due under a single federal loan, the regulation does not specify how a single prepayment should be allocated across student loans when a student loan borrower has more than one loan.

### 3. The Plaintiffs' Prepayments and Allegations Against Defendants

The Plaintiffs all made prepayments during various months falling within the CARES Act Forbearance Period, with the first prepayment by a Plaintiff being made in March 2020, and the last in February 2021.[6] Without providing much detail about how student loan borrowers make

---

[5] Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022. Although the newest extension of the CARES Act Forbearance Period had not been issued prior to the Complaints being filed and the Joint Motion to Dismiss being fully briefed, the Court may take judicial notice of such fact. Fed. R. Evid. 201(b); *see also In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 390 n.34 (D.N.J. 2010).

[6] The Plaintiffs made prepayments in the following manner: Sienna Lyons made monthly prepayments from July through September 2020 (*Lyons*, ECF No. 1, ¶¶ 84–92); Danielle Labella made monthly prepayments in March 2020 and from May through September 2020 (*id.* at 95–108); Saundra O'Donnell made monthly prepayments from April through September 2020 (*id.* at 110–124); Victoria Gallagher made a prepayment in August 2020 (*Gallagher*, ECF No. 1, ¶¶ 74–78); Megan O'Donnell made monthly prepayments from March through June 2020 and in August 2020 (*id.* at ¶¶ 80–92); Gary Strockbine made prepayments in January and February 2021 (*Strockbine*, ECF No. 1, ¶¶ 74–78); Sean Maher made monthly prepayments from March through July 2020 (*id.* at ¶¶ 82–92); and Rachel Ann Philbin made prepayments in March, May, June, August, and September 2020 (*id.* at ¶¶ 96–106).

prepayments, Plaintiffs acknowledge in their class allegations and elsewhere in a footnote that each Plaintiff had the option to select a "custom payment allocation," whereby a Plaintiff's prepayment would be applied to the student loan of the Plaintiff's choice. (ECF No. 1, ¶¶ 94 n.9, 110–12). With the exception of *Strockbine* Plaintiff Sean Maher's May 2020 prepayment (*id.*, ¶ 94 n.9), none of the Plaintiffs chose a "custom payment allocation" indicating the loan to which the prepayment should be applied. (*Lyons*, ECF No. 1, ¶¶ 83–124; *Gallagher*, ECF No. 1, ¶¶ 73–92; *Strockbine*, ECF No. 1, ¶¶ 72–108). The Plaintiffs allege that the Defendants wrongfully applied their prepayments proportionally across the various loans held by each Plaintiff, instead of allocating them to the loans with the highest interest rates. (*Id.*). Plaintiffs allege that this proportional payment allocation method violates federal and state law.

An example of Defendants' proportional payment allocation method is instructive. *Strockbine* Plaintiff Rachel Ann Philbin made a $500 prepayment toward her federal student loans on May 28, 2020, during the CARES Act Forbearance Period and did not select how this prepayment should be applied. (ECF No. 1, ¶ 99). At the time of her prepayment, she had no outstanding interest that had accrued prior to March 13, 2020, so her $500 prepayment was allocated proportionally among the principals of her five federal student loans as follows:

| Loan Disbursement Date | Applied to Principal | Applied to Interest | Interest Rate Assigned Prior to CARES Act |
|---|---|---|---|
| 9/27/2012 | $76.02 | $0.00 | 3.150% |
| 8/25/2013 | $92.85 | $0.00 | 3.610% |
| 8/19/2014 | $113.17 | $0.00 | 4.410% |
| 8/16/2015 | $117.82 | $0.00 | 4.040% |
| 1/3/2017 | $100.14 | $0.00 | 3.510% |

(*Id.* at ¶ 100). She asserts that PHEAA violated federal law when it proportionally allocated her prepayment, as PHEAA should have allocated her $500 prepayment entirely to her loan that had

been assigned a 4.410% interest rate—the highest rate—prior to the CARES ACT Forbearance Period. (*Id.* at ¶¶ 107–109).

In asserting that Defendants violated federal law, Plaintiffs rely on former President Obama's Presidential Memorandum issued in March 2015, which stated its intent to create a "Student Aid Bill of Rights," and directed that "As soon as practicable, the Secretary [of Education] shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate . . . unless otherwise instructed by borrowers."[7]  The *Strockbine* Plaintiffs also rely on guidance issued by the FSA (the "FSA Guidance") on February 17, 2021 (after the *Lyons* and *Gallagher* Complaints were filed), which "expressly requires" student loan servicers, including Defendants, to "allocate any overpayments [or prepayments][8] to a borrower's loans with the highest interest rate first" using the interest rate that was assigned prior to the CARES Act Forbearance Period for those prepayments where the borrower does not provide special instructions indicating to which loan the prepayment should be applied. U.S. DEP'T OF EDUC., G3.21.01, FSA SERVICER GUIDANCE, OVERPAYMENT PROCESS – CARES ACT [hereinafter FSA SERVICER GUIDANCE] (2021), (ECF No. 1 at 12).[9]

---

[7]  Student Aid Bill of Rights to Help Ensure Affordable Loan Repayment, 80 Fed Reg. 13473 (Mar. 13, 2015), https://www.federalregister.gov/documents/2015/03/13/2015-05933/student-aid-bill-of-rights-to-help-ensure-affordable-loan-repayment.

[8]  The Complaints and the joint briefings refer to "prepayments" synonymously with "overpayments," and the Court finds the definitions of each to be substantially similar and immaterial to its analysis. *Compare* 34 C.F.R. § 685.211(a)(2) (2014) ("If a borrower pays any amount in excess of the amount due, the excess amount is a prepayment.") *with* FSA SERVICER GUIDANCE at 1 ("Overpayment:  When a borrower makes a payment when none is due, or pays an amount greater than the monthly payment amount.").

[9]  The Court takes judicial notice of the full text of the guidance document, *In re Synchronoss*, 705 F. Supp. 2d at 390 n.34, and notes that the *Strockbine* Plaintiffs selectively quoted it, omitting the opening portion which states:  "There are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan. Federal regulations instruct only that payments must first be allocated to outstanding interest and fees, and then to principal." FSA SERVICER GUIDANCE at 1.

In asserting that Defendants violated New Jersey and Pennsylvania[10] state law, Plaintiffs rely on representations made on Defendants' websites. The *Lyons* Plaintiffs assert that Great Lakes' and Nelnet's websites advised borrowers that making payments during the CARES Act Forbearance Period could help borrowers "save money in the long run," and that Great Lakes e-mailed borrowers advising them that making prepayments when the interest rates on their loans were set to 0% would make "payments go farther toward reducing the principal balance of your loan amount once any outstanding interest has been paid." (*Lyons*, ECF No. 1, ¶¶ 62–65). The *Gallagher* Plaintiffs allege that Navient provided similar advice on their website that making prepayments could reduce the overall cost of a borrower's loan. (*Gallagher*, ECF No. 1, ¶ 59). The *Strockbine* Plaintiffs allege that PHEAA's website which "was updated on April 2, 2021" promised to allocate prepayments to the loan with the highest interest rate. (*Strockbine*, ECF No. 1, ¶¶ 60–61).

Plaintiffs allege that the "false and misleading statements regarding payment allocation" on Defendants' websites induced them to make prepayments, and that Defendants (i) misrepresented how prepayments were applied to loans, (ii) made false and misleading statements about interest capitalization, (iii) misrepresented the benefits gained by making prepayments, (iv) created a likelihood of confusion or misunderstanding, and (v) purposefully failed to disclose critical information to Plaintiffs regarding the repayment terms of their loans. (ECF No. 1, ¶¶ 183–192).

Plaintiffs allege that Defendants' proportional payment allocation method has resulted in "unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same" and "financial harm associated with lost progress towards loan payoff."

---

[10] Only the *Strockbine* Plaintiffs bring claims under Pennsylvania's UTPCPL.

(*Id.*, ¶ 127). Plaintiffs additionally make class action allegations pursuant to Rule 23 for other individuals who made a prepayment during the CARES Act Forbearance Period without selecting how the payment should be allocated and who have more than one federal student loan with varying interest rates serviced by a Defendant. (*Id.* at 22–26).

## II.     LEGAL STANDARD

In their Joint Motion to Dismiss, Defendants argue under Rule 12(b)(1) that Plaintiffs fail to bear their burden of establishing that the Court has subject matter jurisdiction because the Complaints present no justiciable case or controversy. (ECF No. 11 at 1, 9–14). Defendants assert that regardless of how Plaintiffs' prepayments were allocated across their respective loans by the Defendants, Plaintiffs cannot allege a cognizable injury to date as no interest is accruing; and therefore, it would be impossible for Plaintiffs to have paid any additional amount in principal or interest to date. (*Id.* at 10–11). Defendants argue that Plaintiffs' alleged future injury, that they will pay more in interest over the life of their loans, is too speculative and indefinite to confer Article III standing at this moment. (*Id.* at 9–14).

In their Response in Opposition, Plaintiffs do not dispute that they have not yet paid any interest on their loans that accrued during the CARES Act Forbearance Period, but argue that Defendants' "serial misapplication" of prepayments violates federal and state law, which is enough to establish "concrete injuries in fact" sufficient to establish Article III standing. (ECF No. 15 at 17). Plaintiffs additionally assert that the Defendants' conduct "will result in borrowers paying more over the life of their loans," and that this future harm is sufficiently imminent since interest will again begin to accrue on the Plaintiffs' student loans once the CARES Act Forbearance Period ends. (*Id.*). Plaintiffs further argue that they are entitled to attorneys' fees under the catalyst theory

because they brought about a change in Defendants' conduct making them "prevailing parties." (*Id.* at 41–52).

### A.  Scope of the Rule 12(b)(1) Analysis

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns 'the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). Submitting a signed declaration or otherwise presenting competing jurisdictional facts presents a factual challenge. *Davis*, 824 F.3d at 346. When a party presents a factual challenge to the Court's jurisdiction, a court is not limited to the pleadings in resolving the challenge. *See United States ex rel. Customs Fraud Investigations , LLC. v. Victaulic Co.*, 839 F.3d 281, 251 (3d Cir. 2002) ("When a Rule 12(b)(1) motion is evaluated as a 'factual attack' on the Court's subject matter jurisdiction, the court may consider evidence outside the pleadings in evaluating that attack.").

### B.  Legal Standard for Article III Standing

Pursuant to Article III of the Constitution, this Court may only exercise jurisdiction to resolve "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. "Thus, federal courts can entertain actions only if they present live disputes, ones in which both sides have a personal stake." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). As the party invoking federal jurisdiction at the start of litigation, the plaintiff bears the burden of establishing Article III standing. *Id.* To establish standing, a plaintiff must show (1) "that he [or she] suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "that the injury was likely caused

by the defendant;" and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" *TransUnion*, 141 S. Ct. at 2203 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)).

"To allege injury in fact sufficiently, a plaintiff must claim 'that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162–63 (3d Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components [of injury in fact], as financial harm is a 'classic' and 'paradigmatic form[]' of injury in fact." *Cottrell*, 874 F.3d at 162 (3d Cir. 2017) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 293 (3d Cir. 2005)).

However, "there is a significant difference between . . . an actual harm that has occurred" and "a mere risk of future harm." *TransUnion*, 141 S. Ct. at 2211. The Supreme Court has repeatedly held that a risk of future injury must be "certainly impending" to constitute injury in fact, and that allegations of "*possible* future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*, 504 U.S. at 564 n.2. Of particular importance in this case, imminency "has been stretched beyond the breaking point" where a "plaintiff alleges only an injury at some indefinite

future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Id.*

When a plaintiff fails to establish Article III standing, the court lacks subject matter jurisdiction, *Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016), and dismissal is required, *Goodmann v. People's Bank*, 209 F. App'x 111, 113 (3d Cir. 2006); Fed. R. Civ. P. 12(b)(1). Where the named plaintiff fails to establish Article III standing, the putative class action must be dismissed for lack of subject matter jurisdiction. *Finkelman*, 810 F.3d at 195.

## III.    ANALYSIS

In their Complaints, Plaintiffs allege that Defendants' misallocation of their prepayments has resulted in two injuries:  (i) "unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same" and (ii) "financial harm associated with lost progress towards loan payoff." (ECF No. 1, ¶ 127). Because the Court finds that Plaintiffs have yet to suffer a cognizable injury, and any future harm is too speculative, Plaintiffs lack Article III standing. The Court further concludes that they are not entitled to attorneys' fees.

### A.  Plaintiffs Have Not Suffered a Cognizable Past or Present Injury

Plaintiffs cannot plausibly allege that they have suffered any economic harm because their loans are now and have been continuously frozen in administrative forbearance during the CARES Act Forbearance Period. Defendants correctly highlight that it would be impossible for any unpaid interest to have been added to the Plaintiffs' loan balances as no interest has been accruing on Plaintiffs' federal student loans while the interest rate has been set to 0% since March 2020. In their Response in Opposition, Plaintiffs do not (and cannot) dispute that they have made no payments on loan interest that accrued due to Defendants' proportional payment allocation method. Instead, Plaintiffs argue that Defendants' alleged violation of federal and state law is sufficient to establish Article III standing in itself. This is incorrect, as the Supreme Court has held

14

that "an injury in law is not an injury in fact" sufficient to confer Article III standing. *TransUnion*, 141 S. Ct. at 2205.

In *TransUnion*, the Supreme Court addressed "the Article III requirement that the plaintiff's injury in fact be 'concrete'—that is, 'real, and not abstract.'" *Id.* at 2204 (quoting *Spokeo*, 578 U. S. at 340 (internal quotation marks omitted)). There, a class of consumers brought a class action against the credit reporting agency TransUnion LLC under the Fair Credit Reporting Act ("FCRA") alleging that the agency failed to use reasonable measures to ensure the accuracy of their credit files and instead maintained alerts in those files incorrectly designating the consumers as "terrorists, drug traffickers, or serious criminals." *Id.* at 2009. The class included both members whose erroneously flagged credit reports had been disclosed to third party creditors, and members whose misleading alerts in their credit files had *not* been disclosed to third parties. *Id.* at 2210. After a jury returned a verdict for all class members, the Supreme Court reversed on standing grounds with respect to those plaintiffs whose reports had not been disclosed because, despite the statutory violation, these plaintiffs had not suffered a concrete injury. *Id.* The Court stated: "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 2205 (emphasis in original).[11] Thus, even assuming Plaintiffs could establish a violation of the law, the Plaintiffs in this case, like those in *TransUnion*, simply have no concrete harm sufficient to confer standing—a statutory violation alone does not cut it.

---

[11] The Plaintiffs cite *Freedom from Religion Found. Inc v. New Kensington Arnold School District*, 832 F.3d 469, 473 (3d Cir. 2016), to support their assertion that a violation of federal and state law in itself creates Article III standing. (Opp. Brief, ECF No. 15 at 17). However, *Freedom from Religion* involves Article III standing in an action under the First Amendment's Establishment Clause, which presents a different factual and legal analysis under Article III than presented in this case and thus is inapposite here.

While *TransUnion* addresses whether Congress may create constitutional standing for a plaintiff to bring a claim in federal court alleging a federal statutory violation absent suffering a concrete injury, it does not address the separate issue of whether a *state legislature* can elevate harms to the status of Article III injuries in the context of diversity jurisdiction. *See generally TransUnion*, 141 S. Ct. at 2204–05. This issue of whether a state legislature may create Article III standing in federal court based on a state statutory violation absent a concrete injury from such alleged violation "raises serious federalism concerns," *Finkelman*, 810 F.3d at 196 n.65, yet Plaintiffs cite no case law nor present any argument of how an alleged statutory violation of the NJCFA or UTPCPL, assuming either even applies, may create constitutional Article III standing absent a concrete injury, *see* (Opp. Brief, ECF No. 15 at 17).

Regardless, however, "[w]hatever the contours of Article III, the New Jersey Consumer Fraud Act only permits a private plaintiff to sue when that plaintiff has suffered an 'ascertainable loss of moneys or property.'" *Finkelman*, 810 F.3d at 196 n.65 (quoting N.J. STAT. ANN. § 56:8–19). Although the Court does not reach the merits of Plaintiffs' claims, the Court nonetheless observes that having failed to demonstrate an injury-in-fact in the *constitutional* standing analysis under Article III, it is at least doubtful that Plaintiffs can establish statutory standing to bring an NJCFA claim absent suffering a "real and measurable loss"—the kind of injury that New Jersey law requires. *See Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 794 (N.J. 2005) ("[A] private [NJ]CFA plaintiff [must] demonstrate a real and measurable loss of property or moneys to have [statutory] standing to pursue a [NJ]CFA action."); N.J. STAT. ANN. § 56:8–19; *see also Finkelman*, 810 F.3d at 196 n.65. Similarly, it is not clear to the Court that Plaintiffs have suffered an "actual loss of money or property" to have statutory standing to bring a claim under Pennsylvania's UTPCPL. *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 360 (E.D. Pa. 2013)

16

("[T]he plain language of the statute indicate[s] an actual loss of money or property must have occurred to state a cognizable UTPCPL claim."); *see also* 73 PA. STAT. ANN. § 201–9.2 (requiring a person to have suffered an "ascertainable loss of money or property" to bring a private action under the UTPCPL).

Therefore, in absence of even any persuasive authority provided by Plaintiffs, the Court declines to break new ground by extending the power to confer constitutional standing to state legislatures when the Supreme Court has denied that same power to Congress and where it is not evident to the Court that the Plaintiffs can state a claim under those state statutes. Accordingly, without a concrete injury in fact that gives rise to Article III standing, Plaintiffs' claims must be dismissed for lack of standing.

### B. Plaintiffs' Alleged Future Injuries Are Too Speculative to Confer Article III Standing and Are Not Imminent

Likewise, Plaintiffs' alleged future injury is too speculative to give rise to Article III standing. Plaintiffs' alleged "lost progress towards loan payoff" is an alleged future injury—that Defendants' proportional payment allocation method "will result in borrowers paying more over the life of their loans." (Opp. Brief, ECF No. 15 at 16). Plaintiffs argue this future harm is sufficiently imminent to confer Article III standing because interest will again begin to accrue on the Plaintiffs' student loans once the CARES Act Forbearance Period ends. (*Id.*). However, this Court is not convinced that the alleged future injury will occur the moment that the CARES Act Forbearance Period expires, and student loan interest again begins to accrue. As an initial matter, given the continuing nature of the pandemic and the number of times the CARES Act has been extended, the date when any interest may begin to accrue is indeterminate. Further, the future injury would not materialize until the Plaintiffs have *actually paid* the interest that would not have

accrued but for Defendants' proportional allocation of a Plaintiff's prepayment across that Plaintiff's student loans.

Several cases cited by Defendants support this conclusion, albeit in a slightly different context involving student loan servicers charged with mismanaging federal student loans under the Public Student Loan Forgiveness ("PSLF") program. The PSLF program provides loan forgiveness to student loan borrowers that work in public service and make 120 on-time payments towards repaying their student loans. 34 C.F.R. § 685.219 (2021). Numerous student loan borrowers have brought suit against student loan servicers claiming they were wrongfully denied access to the PSLF program. Courts have generally held that the plaintiff borrowers do not have standing to sue until they have suffered the actual injury alleged: making more than 120 payments while working in public service.

In *Meenan v. Navient Corp.*, the U.S. District Court for the District of Arizona held that the plaintiff student loan borrower would not have had Article III standing to bring suit until the plaintiff's injury arose and became concrete—i.e., once the plaintiff made more than 120 payments towards repaying her student loans. No. 20-08122, 2020 WL 5057654, at *2 (D. Ariz. Aug. 27, 2020). The court denied the defendant loan servicer Navient's motion to dismiss, which argued the plaintiff's claims were barred by the statute of limitations since the borrower became aware years earlier that Navient had erroneously informed the plaintiff that her type of loans were eligible for forgiveness and that she qualified for the PSLF program. *Id.* at *1. The court held that the statute of limitations did not begin to run until the plaintiff's injury arose and became concrete when the plaintiff made her 121st payment, as an injury asserted years earlier would have been considered too speculative to give rise to Article III standing. *Id.* at *3.

18

The U.S. District Court for the Central District of California likewise held that student loan borrowers' alleged injuries that they "will be required" to make more than the necessary 120 payments to obtain loan forgiveness under the PSLF program were hypothetical injuries that were insufficient to confer standing. *Winebarger v. Pa. Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070, 1086 (C.D. Cal. 2019). The court noted that the plaintiffs may or may not make all of their loan payments on time over the next five to seven years, they may not continue to work in public service, or the defendant loan servicer PHEAA may correct any alleged wrongdoing. *Id.* at 1087. Therefore, the alleged future injury of paying more than required when repaying plaintiffs' student loans was "wholly speculative and far too remote to confer standing." *Id.*

Other district courts have held similarly. *See Love v. Pa. Higher Educ. Assistance Agency*, No. 19-02387, 2020 WL 1545798, at *4–5 (N.D. Ga. Mar. 16, 2020) (holding plaintiff loan borrowers did not have Article III standing to bring claims against defendant PHEAA for negligence and breach of contract where plaintiffs alleged that PHEAA had incorrectly tallied plaintiffs' qualifying payments under the PSLF program because (i) plaintiffs had not yet made 120 payments and (ii) plaintiffs may not remain eligible for the program in the future created a "speculative chain of possibilities"); *Alexander v. Great Lakes Higher Educ. Corp*, No. 17-00253, slip op. at *12 (N.D. Fla. June 19, 2021) (holding that while plaintiff loan borrowers had alleged sufficient facts to show misconduct on the part of loan servicer Great Lakes, those plaintiffs that had not yet made sufficient payments to apply for PSLF loan forgiveness had not suffered an Article III injury in fact, and any future injury was too speculative).

Like the plaintiffs in the above-referenced cases, Plaintiffs here allege that they will have to pay more in the future to satisfy their outstanding federal student loans. While the student borrower plaintiffs in the PSLF program alleged they would have to make more than 120 payments

to qualify for loan forgiveness due to those defendants' conduct, Plaintiffs allege that they will have to pay more in interest to fully satisfy their student loan debt due to Defendants' proportional payment allocation method. However, none of the Plaintiffs can say with certainty *when* student loan interest may again begin to accrue, as the CARES Act Forbearance Period has been extended numerous times since the original Complaints were filed, most recently until May 1, 2022.[12] Additionally, no injury would materialize until Plaintiffs have to pay a single dollar towards "wrongfully" accrued student loan interest—which could be years in the future. This "speculative chain of possibilities" is the exact type of "hypothetical or abstract disputes" that federal courts are prohibited from adjudicating under Article III of the Constitution. *TransUnion*, 141 S. Ct. at 2203.[13]

Further buttressing the conclusion that Plaintiffs' alleged injury lacks immediacy, Defendants submitted signed declarations along with their briefing from Nelnet, PHEAA, and Great Lakes stating that all borrowers may contact their respective loan servicers to have the entire amount of prepayments made during the CARES Act Forbearance Period fully refunded, (ECF No. 11 at Ex. 4 ¶ 14, Ex. 5 ¶ 16, Ex. 6 ¶ 10), and PHEAA provides that borrowers may request to

---

[12] Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022.

[13] The parties agree that the issues of standing and ripeness turn on the same question of "whether the threat of future harm . . . is sufficiently immediate to constitute a cognizable injury," *Free Speech Coal., Inc. v. Att'y Gen.*, 825 F.3d 149, 167 n. 15 (3d Cir. 2016), and if the Plaintiffs do not have standing, the claims are also not ripe for judicial review. (ECF No. 11-1 at 14 n.5) (ECF No. 15 at 20 n.16). Where the issue of standing and ripeness "boil down to the same question" the Court may address both issues in tandem. *ASAH v. N.J. Dep't of Educ.*, 330 F. Supp. 3d 975, 1002 (D.N.J. 2018). Because the Plaintiffs lack Article III standing, their claims are also not ripe for judicial review. *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985))).

have prepayments reallocated to the borrower's highest interest rate loan, (ECF No. 11 at Ex. 5 ¶ 16). Nelnet asserts that it is has been allocating prepayments to borrowers' highest interest rate loans since before the CARES Act Forbearance Period began, (ECF No. 11 at Ex. 6, ¶8), and Great Lakes has already reallocated all borrowers' prepayments to each borrower's highest interest rate loan since June 2021 (ECF No. 16 at Ex. 9 ¶ 4). The declarations further state that this information has been available to borrowers on PHEAA's website since April 2020, (ECF No. 11 at Ex. 5 ¶ 16), and on Nelnet's website since May 2020, (*id.* at Ex. 6 ¶ 10).[14] Because submitting signed declarations or presenting competing jurisdictional facts presents a factual challenge to the Court's subject matter jurisdiction, *Davis*, 824 F.3d at 346, the Court may consider these affidavits, *United States ex rel. Customs Fraud Investigations,* 839 F.3d at 251.

In Plaintiffs' Response in Opposition, Plaintiffs do not dispute that Plaintiffs may contact their respective Defendant student loan servicer to have their prepayments reallocated to their highest interest rate loan or refunded. Plaintiffs instead cite *Potts v. Johnson & Johnson Consumer Inc.*, No. 20-10406, 2021 WL 2177386 (D.N.J. May 28, 2021), arguing that a refund offer does not defeat Article III standing, (ECF No. 15 at 20), that any refund offer does not moot their claims, (*id.* at 10), and any reallocation or offered reallocation was made in response to Plaintiffs' cases, making Plaintiffs "prevailing parties" entitled to attorneys' fees, (*id.* at 41–51). The Court addresses Plaintiffs' argument for attorneys' fees below, and does not address the parties' mootness arguments because its injury-in-fact analysis is dispositive. The Court does not find *Potts* instructive to its injury-in-fact analysis given the dissimilarity of the injuries alleged. The *Potts*

---

[14] Navient did not submit a declaration, instead noting in a footnote that it was "planning to implement changes to its allocation methodology." (ECF No. 11 at 17 n.9). The Court's analysis regarding Plaintiffs' control over alleged future harm is therefore narrowed to include only the *Lyons* and *Strockbine* Plaintiffs.

plaintiffs did not allege future injuries as the Plaintiffs do here, but past physical injuries as well as economic injuries, and the refund offer at issue was for the cost of cosmetic products alleged to have caused those injuries. *Potts*, 2021 WL 2177386, at *5.

Despite Plaintiffs' arguments to the contrary, the Court views the ability of Plaintiffs to control the allocation of their prepayments (via either a refund to allocate per their wishes or via a request to the Defendant to reallocate) to have "stretched beyond the breaking point" Article III's immediacy requirement because "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2. The alleged future injury of paying excess interest is certainly more than "partly" within the Plaintiffs' own control, because a Plaintiff may at any time contact their respective Defendant student loan servicer and request that their prepayments be reallocated to their highest interest rate loan, avoiding any injury from ever occurring. "[T]he underlying purpose of the imminence requirement" is to avoid this exact scenario: a court "render[ing] an advisory opinion in 'a case in which no injury would have occurred at all.'" *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting *Lujan*, 504 U.S. at 564 n.2).

Courts have routinely held that a plaintiff has failed to demonstrate imminent harm where a plaintiff has control over an alleged future injury coming to pass. In *Animal Legal Defense Fund*, a psychobiologist was one of several plaintiffs who brought suit against the Department of Agriculture for its failure to include rats, mice, and birds in the definition of "animals" under the Federal Laboratory Animal Welfare Act, which would have required research laboratories registered under the Act to employ humane treatment of the rats and mice used in research. 23 F.3d at 498–99. The psychobiologist had left the research field six years prior but intended to return to conduct research in registered laboratories in order to advance her career. *Id.* at 500. She

alleged that she would be unable to control whether laboratories humanely treated the rodents used in her planned research studies, and that the inhumane treatment would directly impair her ability to perform her research because she would be required to spend time advocating for the facility to employ humane treatment. *Id.* The D.C. Circuit stated that the plaintiff was not in immediate danger of sustaining this alleged injury because whether she returned to the research field was "wholly within her control," and she could exercise her choice to determine whether "to subject herself" to the future injury. *Id.* at 500–01.

In *Pennsylvania Prison Society v. Cortes*, the Third Circuit held that the future harm that prisoner plaintiffs may experience, being unable to be paroled due to changes to Pennsylvania's Board of Pardons, was not imminent because applying to the Board of Pardons for parole or a commuted sentence was within the plaintiffs' control, and no plaintiff presented evidence of having submitted such an application. 508 F.3d 156, 166 (3d Cir. 2007). In *New Jersey Physicians, Inc. v. Obama*, the plaintiff's potential subjection to the individual mandate under the Affordable Care Act was not an immediate harm to confer Article III standing, because *inter alia* it was possible that he would not be subject to the mandate if he secured health insurance through an employer before the mandate became effective in 2014—a factor that was within the plaintiff's control. 757 F. Supp. 2d 502, 507–08 (D.N.J. 2010), *aff'd sub nom. New Jersey Physicians, Inc. v. President*, 653 F.3d 234 (3d Cir. 2011).

The fact that Plaintiffs may contact their respective student loan servicer to have their prepayments refunded or reallocated per their wishes "stretches" immediacy "beyond the breaking point." *Lujan*, 504 U.S. at 564 n.2. This Court will not conduct mathematical gymnastics to determine when the Plaintiffs may be required to pay "wrongfully accrued" student loan interest, nor will the Court issue an advisory opinion where Plaintiffs maintain the choice over whether "to

subject [themselves]" to the future injury, and the future injury may never occur at all. *Animal Legal Def. Fund*, 23 F.3d at 500–01.

### C. Plaintiffs' Request for Attorneys' Fees Based on State Law Claims

Being unable to allege any past or immediate future injury, Plaintiffs next argue that if Defendants changed their conduct to reallocate prepayments either retroactively or prospectively, that the Plaintiffs are "prevailing parties" entitled to attorneys' fees under the catalyst theory, since Defendants changed their default payment allocation method "[a]s a direct result of this litigation." (ECF No. 15 at 41–42). "Under the catalyst theory . . . a litigant will qualify as a 'prevailing party' entitled to an award of attorney's fees under a fee-shifting statute if the lawsuit 'achieves the desired result because [it] brought about a voluntary change in the defendant's conduct.'" *D. Russo, Inc. v. Twp. of Union*, 9 A.3d 1089, 1092–93 (N.J. Super. Ct. App. Div. 2010) (quoting *Mason v. City of Hoboken*, 951 A.2d 1017, 1029 (N.J. 2008)); N.J. STAT. ANN. § 56:8-19. "In the absence of a judgment or enforceable consent decree, the catalyst theory entitles a plaintiff to an award of attorney's fees if it 'can demonstrate: (1) a factual causal nexus between plaintiff's litigation and the relief ultimately achieved; and (2) that the relief ultimately secured by plaintiffs had a basis in law.'" *Id.* at 1093 (quoting *Singer v. State*, 472 A.2d 138, 142 (N.J. 1984)).

Both the NJCFA and the UTPCPL are fee-shifting statutes. *See* N.J. STAT. ANN. § 56:8-19; 73 PA. CONS. STAT. § 201-9.2. Under New Jersey law, a party is considered a "prevailing party" when they "'obtain an enforceable judgment against the defendant . . . or comparable relief through a consent decree or settlement.'" *Tarr v. Ciasulli*, 853 A.2d 921, 930 (N.J. 2004) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)). In other words, a party must achieve "'relief on the merits of his [or her] claim.'" *Id.* (quoting *Farrar*, 506 U.S. at 111). A plaintiff cannot be entitled to attorneys' fees under the NJCFA as a "prevailing party" when their claim cannot survive a

motion to dismiss. *See Perez v. Prof. Green LLC*, 73 A.3d 452, 463–65 (N.J. 2013); *Weinberg v. Sprint Corp.*, 801 A.2d 281, 293 (N.J. 2002) (holding that "a plaintiff, who pleads but cannot survive a motion for summary judgment" may not assert a claim for attorneys' fees under the NJCFA). As to a claim brought under the UTPCPL, Plaintiffs cite no cases applying the catalyst theory to such a claim, and this Court's "independent research did not locate any such decision." *Gonzalez v. Owens Corning Sales, LLC*, 367 F. Supp. 3d 381, 387 (W.D. Pa. 2019), *aff'd sub nom. Gonzalez v. Owens Corning*, 813 F. App'x 53 (3d Cir. 2020) (similarly noting the dearth of decisions applying the catalyst theory to any UTPCPL claim). The court in *Gonzalez* relied on the Third Circuit's decision in *Templin v. Independence Blue Cross*, 785 F.3d 861 (3d Cir. 2015), to state that, "[e]ven if the court had authority to consider counsel fees under the catalyst theory, it would decline to award them" because the plaintiffs did not obtain success "on the merits" of their UPTCPL claim, and that "victory on procedural motions will not suffice." *Id.* at 386–87 (citing *Templin*, 785 F.3d at 867 n.3).

Defendants argue that neither the NJCFA nor the UTPCPL apply to their conduct as they are federal student loan servicers retained by the DOE to service loans held by the DOE, and therefore, they have not sold or advertised any merchandise or real estate to Plaintiffs for their conduct to be regulated by the NJCFA, nor have they sold any goods or services to Plaintiffs for their conduct to fall under the UTPCPL. (ECF No 11 at 41–43 (citing *Lyons* Compl., ECF No. 1, ¶¶ 15, 28)); *see* N.J. STAT. ANN. § 56:8-2 (describing unlawful practices "in connection with the sale or advertisement of any merchandise or real estate"); 73 PA. CONS. STAT. § 201-9.2 (listing elements of private actions to be brought by "[a]ny person who purchases or leases goods or services").

Defendants cite *Huertas v. Galaxy Asset Management*, arguing that the NJCFA is "intended to encompass only consumer oriented commercial transactions involving the marketing and sale of merchandise or services," 641 F.3d 28, 35 (3d Cir. 2011), and cite cases where courts have dismissed claims when a defendant's alleged practices or statements are not made in connection with the marketing or sale of merchandise or real estate. *See Brancato v. Specialized Loan Servicing, LLC*, 2018 WL 2770137, at *7 (D.N.J. June 8, 2018) (dismissing NJCFA claim where plaintiff "never bought any merchandise or real estate" from defendant mortgage loan servicer); *Boyko v. Am. Int'l Group, Inc.*, 2009 WL 5194431, at *4 (D.N.J. Dec. 23, 2009) (dismissing NJCFA claim where defendant debt collector had not "sold merchandise or real estate" to plaintiff and stating "debt collection efforts on behalf of a third party who might have sold merchandise is not itself a sale of merchandise"). Relying on two Third Circuit cases, Defendants argue that a private individual must have purchased or leased goods or services to have statutory standing under the UTPCPL. *Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238, 240 (3d Cir. 2002); *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 65 (3d Cir. 1994) ("The [UTPCPL] contemplates as the protected class only those who purchase goods or services, not those who may receive a benefit from the purchase.").

In response, Plaintiffs argue that the NJCFA's definition of "merchandise" includes "services," N.J. STAT. ANN. § 56:8-1(c), which clearly includes Defendants as student loan servicers, and that it was the New Jersey Legislature's intent for the NJCFA to be interpreted broadly to combat consumer fraud. (Opp. Br., ECF No. 15 at 38 (citing *Lemelledo v. Beneficial Management Corp. of America*, 696 A.2d 546 (N.J. 1997)). Plaintiffs further rely on *Manetta v. Navient Corp.*, where another court in this district has held that a plaintiff student loan borrower's NJCFA claim survived a motion to dismiss against federal student loan servicer Navient

Corporation. No. 20-7712, 2021 WL 2886115, at *5 (D.N.J. July 8, 2021). Similarly, Plaintiffs

argue that the UTPCPL should be interpreted broadly to protect consumers from fraud and unfair

or deceptive business practices. *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881 (Pa. 2007), and cite

several cases where the UTPCPL has been applied in the mortgage loan servicing context,

*Hollenshead v. New Penn Financial, LLC*, 447 F.Supp.3d 283 (E.D. Pa. 2020); *Trunzo v. Citi

Mortg.*, 876 F.Supp.2d 521 (W.D. Pa. 2012).

Having reviewed the case law cited by the parties, the Court is doubtful that the NJCFA

applies to federal student loan servicers and does not find *Manetta* instructive because the issue of

the statute's applicability was neither argued by the parties or addressed in that court's ruling. 2021

WL 2886115, at *5. Further, the applicability of the UTPCPL to Defendants' conduct where

Plaintiffs transacted with the DOE—not Defendants—to borrow federal student loans is far from

clear. *Compare Balderston*, 285 F.3d at 241 ( "[T]he [UTPCPL] unambiguously permits only

persons who have purchased or leased goods or services to sue. . . . Had the Pennsylvania

legislature wanted to create a cause of action for those not involved in a sale or lease, it would

have done so." (internal quotation marks omitted)) *with Nigro v. Pa. Higher Educ. Assistance

Agency,* No. 19-02000, 2020 WL 5369980, at *10 (M.D. Pa. Sept. 8, 2020) (dismissing plaintiff

student loan borrower's claim under the UTPCPL's "catchall" provision but granting plaintiff

leave to amend complaint against defendant PHEAA).

However, for the Court to rule on whether either statute is intended to regulate Defendants'

conduct as federal student loan servicers, it would be required to reach the merits of Plaintiffs'

claims, which is improper when this Court lacks subject matter jurisdiction. *Finkelman*, 810 F.3d

at 193 ("A federal court's obligation to assure itself that it has subject matter jurisdiction over a

claim is antecedent to its power to reach the merits of that claim."). Furthermore, the catalyst

theory, as interpreted by New Jersey courts, requires a Plaintiff to obtain relief *on the merits* of their claim, *Tarr*, 853 A.2d at 930, which Plaintiffs have not achieved here, and the Court is doubtful that the catalyst theory is even applicable to the UTPCPL, particularly where the Third Circuit has described this doctrine as "moribund," *Cottrell v. Nicholson Props. LLC*, No. 12-02128, 2018 WL 4062723, at *13 (D.N.J. Aug. 24, 2018), *aff'd*, 768 F. App'x 148 (3d Cir. 2019) (quoting *A.P. Boyd, Inc. v. Newark Pub. Schs.*, 44 F. App'x 569, 573 (3d Cir. 2002)). This Court refuses to reach beyond its jurisdiction, and Plaintiffs' request for attorneys' fees is denied as a matter of law.[15] *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 186 (4th Cir. 2013) (affirming district court's denial of party's motion for attorneys' fees because dismissal for lack of Article III standing "does not constitute a decision on the merits").

Having concluded that this Court lacks subject matter jurisdiction over these actions, the Court will not address Defendants' remaining arguments,[16] and Plaintiffs' Complaints are dismissed without prejudice. *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 119 (3d Cir. 2019) (discussing that a case should be dismissed without prejudice where the plaintiff lacks Article III

---

[15] The Court further notes that Plaintiffs' request for attorneys' fees being included in its Response in Opposition to the Joint Motion to Dismiss is procedurally improper. *See* Fed. R. Civ. P. 54(d)(2).

[16] Because the Court finds the issue of whether the Plaintiffs have met their burden of showing an injury in fact to establish Article III standing to be dispositive of the pending Joint Motion to Dismiss, the Court does not address the parties' arguments regarding traceability under Article III, issues of mootness, any arguments that Plaintiffs' Complaints fail to state a claim under Rule 12(b)(6), or class allegations under Rule 12(f) and Rule 23(d)(1)(D). *See Finkelman*, 810 F.3d at 203 (3d Cir. 2016); *Fensterer v. Cap. One Bank (USA), N.A.*, No. 20-05558, 2021 WL 838333, at *4 (D.N.J. Mar. 5, 2021). The Court also does not reach Nelnet's argument that they did not service the *Lyons*' Plaintiffs' loans, as this presents a fact issue that cannot be resolved on a motion to dismiss under Rule 12(b)(6). However, the Court does not find this issue of disputed fact relevant to the outcome of this Motion because the Plaintiffs lack Article III standing, and the Complaints are dismissed under Rule 12(b)(1).

standing and the district court has no subject matter jurisdiction to reach the merits of the claims); *see also Finkelman*, 810 F.3d at 195 ("Absent [Article III] standing on the part of the named plaintiffs, we must dismiss a putative class action for lack of subject matter jurisdiction.").[17]

## IV.    CONCLUSION

For the reasons stated herein, Defendants' Joint Motion to Dismiss (*Lyons*, ECF No. 33; *Gallagher*, ECF No. 23; *Strockbine*, ECF No. 11) is **GRANTED**, Plaintiffs' Complaints (*Lyons*, ECF No. 1; *Gallagher*, ECF No. 1; *Strockbine*, ECF No. 1) are **DISMISSED WITHOUT PREJUDICE**, and the Clerk of the Court is ordered to close these Cases. An appropriate order follows.

Date: March 1, 2022

/s/ Christine P. O'Hearn
**Christine P. O'Hearn**
**United States District Judge**

---

[17] Plaintiffs have requested leave to amend their Complaints in their Response in Opposition to address the pleading deficiencies outlined in this Opinion, (ECF No. 15 at 54), but have not filed a motion or done so properly. "[F]ailure to submit a draft amended complaint is fatal to a request for leave to amend. . . .  [W]e [have] held that a district court need not worry about amendment when the plaintiff does not properly request it." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007). Plaintiffs have made that fatal error here, and thus the Court denies their request. Further, the Court cannot conceive of any facts that Plaintiffs could plead that would change the analysis as outlined herein.